IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

EDWARD TREAT, *et al.,*

                                        Plaintiffs,      Civil Action No.
             v.                                9:12-CV-0602 (GLS/DEP)

CENTRAL NEW YORK PSYCHIATRIC
CENTER, *et al.,*

                                          Defendants.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFFS:

EDWARD TREAT, *Pro Se*
#345241
CNYPC
P.O. Box 300
Marcy, NY 13403

LARRY BROWN, *Pro Se*
#246987
CNYPC
P.O. Box 300
Marcy, NY 13403

MYRON WRIGHT, *Pro Se*
#16906
CNYPC
P.O. Box 300
Marcy, NY 13403

RICHARD ZIMMER, *Pro Se*
#26118
CNYPC
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN   DOUGLAS J. GOGLIA, ESQ.
New York State Attorney General  Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiffs Edward Treat, Larry Brown, Myron Wright, and Richard

Zimmer, four convicted sex offenders who have been involuntarily committed to

the Central New York Psychiatric Center ("CNYPC") for treatment, have

commenced this action, pursuant to 42 U.S.C. § 1983, against the New York

Office of Mental Health ("OMH") and several OMH employees alleging

deprivation of their civil rights.  While their complaint advances other claims,

including those based upon the New York State Constitution and various state

laws and regulations, plaintiffs primarily allege that they have been deprived of

life's necessities by virtue of recently enacted bathroom and shower usage

policies at the CNYPC, in violation of their right to substantive due process

2

under the Fourteenth Amendment to the United States Constitution. It is also

alleged that employees at the CNYPC have violated section 504 of the

Rehabilitation Act, 29 U.S.C. § 794, through the administration of a resident

worker program.

In response to plaintiffs' complaint, defendants have filed a pre-answer

summary judgment motion seeking dismissal of plaintiffs' claims as a matter of

law. For the reasons set forth below, I recommend that the motion be granted,

plaintiffs' federal claims be dismissed, and the court decline to exercise

supplemental jurisdiction over the remaining state law claims.

## I.    BACKGROUND[1]

The CNYPC is a mental health facility located in Marcy, New York, and

operated by the OMH. Nowicki Decl. (Dkt. No. 27-4) at ¶ 2. Upon enactment of

the Sex Offender Management and Treatment Act ("SOMTA"), which became

effective on April 13, 2007, the CNYPC became designated as a "secure

treatment facility" as defined under N.Y. Mental Hygiene Law ("MHL") §§ 7.18

and 10.03(o) for the purpose of administering a Sex Offender Treatment

Program ("SOTP") under the SOMTA. *Id.* ¶¶ 4-6. Each SOTP participant at the

---

[1]    In light of the procedural posture of the case the following recitation is derived
from the record now before the court, with all inferences drawn and ambiguities resolved in
favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

CNYPC is an involuntarily committed, formerly incarcerated sex offender or violent offender who has committed a sexually motivated offense and has been found by a state court to be a dangerous sex offender requiring confinement.[2] *Id.* at ¶ 7.

Plaintiffs Edward Treat and Myron Wright are convicted felons who have been civilly committed to the CNYPC for the purpose of undergoing SOTP. Complaint (Dkt. No. 1) at ¶¶ 10, 14. Plaintiffs Larry Brown and Richard Zimmer are currently civil detainees at the Center, awaiting trial to determine whether they, too, should be detained for the purpose of participating in SOTP. *Id.* at ¶¶ 12, 16.

OMH personnel and staff at the CNYPC assist SOTP-enrolled sex offenders in managing their deviant behavior, while at the same time insuring the operation of a secure facility that protects the community, the staff, and the

---

[2]     Under New York law, a "dangerous sex offender requiring confinement" is defined as a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." N.Y. MHL § 10.03(e). The MHL does not allow for indefinite confinement of a detained sex offender. Instead, the commissioner of the OMH is required to provide a civilly committed sex offender and his counsel with annual notice of the right to petition the court for discharge, and must assure that each person so confined receives an examination for evaluation of his mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement. N.Y. MHL § 10.09(a) - (b). The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. N.Y. MHL § 10.09(d).

residents themselves.  Nowicki Decl. (Dkt. No. 27-4) at ¶¶ 8-9.  SOTP

participants are housed in seven residential units, each of which can

accommodate approximately twenty-six patients.  *Id.* at ¶ 14.  Each residential

unit includes a bathroom containing four toilet stalls and a urinal, and a

residential shower room with two shower stalls, each equipped with a shower

curtain.  *Id.* at ¶ 15.  In addition, there are bathrooms located in the CNYPC

treatment mall and activity center; the layouts of those bathrooms are similar to

those in the residential wards.  *Id.*

Between the hours of 7:00 a.m. and 11:00 p.m., each residential ward,

with the exception of the Making a Pro-Social Stance ("MAPSS") unit, which

houses residents with high psychopathy (and is therefore more extensively

staffed), is monitored by three Secure Care Treatment Aids ("SCTAs").[3]

Nowicki Decl. (Dkt. No. 27-4) at ¶ 16.   During the remaining hours, between

11:00 p.m. and 7:00 a.m., there are two SCTAs stationed in the regular

residential units.  *Id.*

Prior to May 2010, a number of incidents occurred in SOTP bathrooms,

including voluntary and involuntary sexual activities in the bathroom and shower

stalls, as well as several fights.  Nowicki Decl. (Dkt. No. 27-4) ¶¶ 18, 19.  Staff

---

[3]        None of the plaintiffs reside in the MAPSS unit.  Nowicki Decl. (Dkt. No. 27-4)
at ¶ 16.

at the CNYPC also observed that residents were using bathrooms and showers to hide and pass contraband, including weapons, pornography, and tobacco all of which were found hidden in toilet paper dispensers, behind toilets, in garbage cans, and above tiles in the drop ceilings. *Id.* at ¶ 20. To address these incidents, on May 19, 2010, the CNYPC implemented an emergency policy for SOTP units that required the bathrooms in both the residential portions of the facility, as well as those in the treatment mall and activity center, be monitored by SCTAs at all times. *Id.* at ¶ 21. In addition, the use of bathrooms and shower rooms within the SOTP was restricted to one resident at a time. *Id.* Under the emergency policy, the bathroom in the treatment mall was to remain locked while residents were in treatment, changing classrooms, being transported to and from the treatment mall, and at other times when SCTAs were unavailable to monitor the area. *Id.*

Shortly after implementation of the emergency policy, employees at the CNYPC determined that certain residents required greater access to bathrooms due to physical or medical problems, or mobility limitations. Nowicki Decl (Dkt. No. 27-4) at ¶ 22. For those residents, access to the bathrooms was allowed even if another resident was already present, provided that an SCTA remained present in the bathroom to continuously monitor the area. *Id.*

6

A similar emergency policy was implemented on May 24, 2010, governing access to the showers on the residential units. Nowicki Decl. (Dkt. No. 27-4) at ¶ 23. Pursuant to that new, emergency policy, only one resident was allowed into the shower room at a time, and residents were required to register in advance for fifteen minute shower time slots during specified periods when SCTAs would be available to monitor the shower room, thus excluding meal times and periods and when medications were dispensed. *Id.*

On July 13, 2010, final "Resident Bathroom and Shower Policies" were adopted at the CNYPC, replacing the emergency policies implemented in May 2010. Nowicki Decl. (Dkt. No. 27-4) at ¶ 24; Nowicki Decl. Exh. C (Dkt. No. 27-8). Under the new bathroom policy, multiple residents are permitted to simultaneously use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m. Nowicki Decl. (Dkt. No. 27-4) at ¶ 25. The single use practice, however, remains in effect under the new policy for the hours of 11:00 p.m. to 7:00 a.m. in the residential units, and at all times for the bathroom in the treatment mall. *Id.* Under the new policy, residents with medical issues who have obtained authorization from a CNYPC physician are allowed to access a bathroom, as needed, with staff approval. *Id.* The final shower policy expanded the hours during which fifteen-minute shower slots

were available, including between 5:00 a.m. and 7:00 a.m., as well as during other times of the day when residents are not in programming, therapy, or meals.  Nowicki Decl. (Dkt. No. 27-4) ¶¶ 24, 26; Nowicki Decl. Exh. D (Dkt. No. 27-9).

Unrelated to the bathroom and shower policies at the CNYPC are the opportunities available to SOTP residents to participate in a work program. Nowicki Decl. (Dkt. No. 27-4) at ¶¶ 29-35.  Residents at the CNYPC who are undergoing SOTP may qualify for the work program when they advance to a specified point in their treatment and programming, and are referred into the program by their primary therapist.  *Id.* at ¶ 33.  The resident's physician must approve a work referral before it is submitted.  *Id.*

Under the work program, SOTP residents may be assigned to work in the copy center, furniture repair, sewing, laundry, on-mall janitorial, on-unit janitorial, and the library.  Nowicki Decl. (Dkt. No. 27-4) at ¶ 34.  Participation in the worker program is privilege that residents earn, and, as such, is neither a right nor a requirement for treatment.  *Id.* at ¶ 32.  By regulation, when residents volunteer to work, they are guaranteed payment of at least the prevailing federal minimum wage.  *Id.* at ¶¶ 28.  The work program at the CNYPC is so popular among SOTP residents that there is a waiting list to fill program jobs,

which are limited in number.  *Id.* at ¶ 35.

In their complaint in this action, plaintiffs intimate that they have been forced to work in order to allow the CNYPC to be profitable.  *See generally* Complaint (Dkt. No. 1).  As a result of that allegation, plaintiffs were removed from the SOTP work program and relieved of their jobs following commencement of the action, although they have been informed that, should they wish to voluntarily participate in the work program in the future, they remain free to do so.  Nowicki Decl. (Dkt. No. 27-4) at ¶ 36*; see also* Brown Decl. Exh. 22 (Dkt. No. 39) at 72.

Among the complaints lodged by the plaintiffs in this action is the alleged inadequacy of vocational programs, including the lack of computer training, at the Center.  *See*, *e.g.*, Complaint (Dkt. No. 1) at ¶¶ 63-65, 110-116; Brown Aff. (Dkt. No. 1) at ¶ 30.  Generally, however, SOTP residents at the CNYPC are not allowed to use computers.  Nowicki Decl. (Dkt. No. 27-4) at ¶ 38.  While at one point there was a computer laboratory where residents could receive training in computer skills, because certain residents were found to be making improper use of the computers, the program was abandoned.  *Id.* at ¶¶ 39-41.

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on April 10, 2012.  Dkt. No. 1.  Named as defendants in plaintiffs' complaint are the OMH; Michael F. Hogan, Commissioner of the OMH; Maureen Bosco, the Acting Executive Director of the CNYPC; Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC; Terri Maximillian, Director of Clinical Services for the SOTP at the CNYPC; Marianne Madia, a Nurse Administrator at the CNYPC; Anthony Gonzalez, Director of Risk Management at the CNYPC; James Morgan, Associate Director of Quality Management at the CNYPC; Elaine Dziadyk, Acting Deputy Director of Rehabilitative Services at the CNYPC; Miya L. Burt, a Psychiatric Nurse and Ward Supervisor at the CNYPC; and Barbara Miller, CNYPC's Director for Administrative Services.  *Id.* at ¶¶ 18-37.  Each of the individual defendants is sued only in his or her official capacity.  *Id.* at ¶¶ 19-37.  Plaintiffs' complaint asserts several federal and state claims, including (1) violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution; (2) violation of the due process clause of the New York State Constitution; (3) deprivation of the rights guaranteed under Article XVII, Section 1 of the New York State Constitution; (4) violation of plaintiffs' right for equal protection under the Fourteenth Amendment

(although plaintiffs identify this cause of action as violating their rights under the Eighth Amendment); (5) violation of section 504 of the Rehabilitation Act; and (6) violation of New York State Mental Hygiene Law and corresponding rules and regulations. *Id.* at 26-33.

Following an initial review of plaintiffs' complaint and accompanying *in forma pauperis* ("IFP") applications, Chief District Judge Gary L. Sharpe issued an order on June 21, 2012, (1) granting plaintiffs' IFP applications; (2) dismissing any claims arising under section 504 of the Rehabilitation Act and asserted against defendants Dziadyk, Maximillian and Nowicki in their individual capacities; (3) construing plaintiffs' Eighth Amendment (identified in the complaint as plaintiffs' fourth claim for relief) as a cause of action arising under the Fourteenth Amendment in light of the plaintiffs' status as civil detainees; and (4) denying plaintiffs' motion for class certification, without prejudice to renewal. Dkt. No. 7.

In response to plaintiffs' complaint, defendants filed a pre-answer motion for summary judgment on September 28, 2012.[4] Dkt. No. 27. In their motion,

---

[4]     Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint. *Compare* Fed. R. Civ. P. 12(b)(6) *with* Fed. R. Civ. P. 56. In light of the fact that, by moving for summary judgment, defendants are actively defending against plaintiff's claims, and in order to avoid any argument that they have defaulted, in my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty-one days after a final determination is issued with respect to defendants' motion, in the event that

defendants argue that no reasonable factfinder could conclude that plaintiffs'

rights under the Fourteenth Amendment and section 504 of the Rehabilitation

Act have been violated by their conduct, and further seek dismissal of any

damage claims under section 504 based upon the Eleventh Amendment.  *Id.*

Plaintiffs have since responded in opposition to defendants' motion.  Dkt. Nos.

38-40.  Defendants' motion, which is now fully briefed and ripe for

determination, has been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of

New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    BACKGROUND

A.    Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, the entry of summary judgment

is warranted "if the movant shows that there is no genuine dispute as to any

material facts and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of*

---

the action survives. *Snyder v. Goord*, No. 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y.
Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M. J.).

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).

A fact is "material" for purposes of this inquiry, if it "might affect the outcome of

the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys*

*v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A

material fact is genuinely in dispute "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be decided

with respect to any essential element of the claim in issue, and the failure to

meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4;

*Sec. Ins. Co.*, 391 F.3d at 83.  In the event this initial burden is met, the

opposing party must show, through affidavits or otherwise, that there is a

material dispute of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324;

*Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any

ambiguities, and draw all inferences, in a light most favorable to the nonmoving

party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d

Cir. 1998).  The entry of summary judgment is justified only in the event of a

finding that no reasonable trier of fact could rule in favor of the non-moving

party.  *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

>    B.    Plaintiff's Due Process Claim Arising Under the U.S. Constitution

Plaintiffs' complaint asserts claims arising from alleged violations of their rights under a number of constitutional provisions, including the Eighth Amendment.  Complaint (Dkt. No. 1) at 29-30.

When plaintiffs were released by the DOCCS into the CNYPC, they had finished serving their terms of imprisonment, and thus were no longer prison inmates.  The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, therefore is not applicable under the circumstances, and plaintiff's claim arises instead under the Fourteenth Amendment.  *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) (holding that the respondent, who was involuntarily committed to a state institution for the mentally retarded, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment).  "The Supreme Court has explained that 'when the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some

responsibility for [his] safety and general well-being.'" *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)). In this case, plaintiffs' challenges to the various policies and practices referenced in their complaint must therefore be analyzed within the framework of the due process clause of the Fourteenth Amendment. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *Dove v. City of New York*, No. 03-CV-5052, 2007 WL 805786, at *7 (E.D.N.Y. Mar. 15, 2007).[5]

Because the due process clause requires that civilly committed patients be provided with protections at least as extensive as those to which convicted prisoners are entitled, however, the Eighth Amendment provides a suitable starting point for analysis of plaintiffs' claims. *Sain*, 512 F.3d at 893. Under the Eighth Amendment, state officials are required to provide convicted inmates with housing under "humane conditions," and to afford them "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also Sain*, 512 F. 3d at 893. A claim alleging that conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement. *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 297 (1991)). The

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

plaintiff must establish that the conditions are "sufficiently serious" from an objective point of view, and additionally that prison officials acted with "deliberate indifference."[6] *Leach,* 103 F. Supp. 2d at 546; *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.); *see also Wilson*, 501 U.S. at 303. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Leach*, 103 F. Supp. 2d at 546; *Waldo*, 1998 WL 713809, a *2.

In analyzing the shower and bathroom policies at issue in this case, the court must balance plaintiffs' substantive rights against the state's interest in "'maintaining institutional security and preserving internal order.'" *Ahlers v. Robinowitz*, 684 F.3d 53, 61 (2d Cir. 2012) (quoting *Bell v. Wolfish*, 441 U.S.

---

[6]     Applying the reasoning embodied in the Supreme Court's decision in *Youngberg*, some courts have applied a more narrow subjective standard, particularly against defendants who could be characterized as "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice or standard" as distinct from the broader "deliberate indifference" standard. *Youngberg*, 457 U.S. at 323; *see Dove*, 2007 WL 805786, at *7-8; *Vallen v. Carrol,* No. 02-CV-5666, 2005 WL 2296620, at *8-9 (S.D.N.Y. Sept. 20, 2005). Like the courts in *Dove* and *Vallen*, however, I find it unnecessary to determine which of these standards of review should apply in the current action because I find that no reasonable factfinder could conclude that the policies challenged by plaintiffs in their complaint run afoul of the constitution under either.

520, 546 (1979)).  It is true that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  *Youngberg*, 457 U.S. at 321-22.  As the Second Circuit has noted, "[h]owever, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." *Ahlers,* 684 F.3d at 61.  In determining whether a proper balance of those competing considerations has been struck, a court must afford the defendants' decisions a "presumption of correctness."  *Id.* (quotation marks omitted).

In this instance, the interests of the state, cited by defendants as the genesis of the emergency bathroom and shower policies in May 2010, and the new, permanent policies that took effect in July of 2010, are compelling. According to Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC, the modification of policies was motivated by security concerns, including concerns about residents fighting, engaging in both involuntary and voluntary sexual activity, and trafficking of contraband inside the bathrooms and showers.  These are legitimate security concerns that can justify the implementation of policies placing restrictions upon the use of bathroom and shower facilities within the Center.  *See Bell*, 441 U.S. at 553 (finding a

prison facility's policy prohibiting inmates from receiving packages from outside the facility containing food items or personal property justifiable based on evidence that the introduction of such packages would require an inordinate amount of time to inspect, increase the risk of inmate conflicts, and introduce a storage and sanitation problem into the facility); *accord*, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1516 (2012) ("Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell*.").

Balanced against these legitimate concerns is the relatively modest imposition upon the plaintiffs. Plaintiffs do not allege that they are denied the right to shower daily resulting from the revised policies. Instead, they complain that the requirement to sign up for an available time slot to shower some how violates their constitutional rights. Similarly, while plaintiffs do not contend that they are deprived of the opportunity to utilize a bathroom, they suggest that, on the occasions that they are required to wait as long as five or ten minutes, their rights are violated.[7] These contentions, however, are not unsupported by any applicable legal authority. *See Odom v. Keane*, No. 95-CV-9941, 1997 WL

_____

[7]     The policy currently in place permits more than one CNYPC resident to utilize residential bathroom facilities, under supervision by an SCTA, between the hours of 7:00 a.m. and 11:00 p.m. In addition, the policy allows for accommodations for those residents with medical issues requiring more frequent bathroom breaks.

576088, at *5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (finding that the plaintiff's conditions of confinement claim was legally deficient where there was evidence that his "toilet functioned approximately twelve hours every day, time enough to dispose of [his] bodily wastes"); *accord*, *McGee v. Pallito,* No. 10-CV-0011, 2011 WL 6291954, at *6 (D. Vt. Aug. 3, 2011). The constitution requires only "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination[.]" *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994). Having reviewed the record, I find that no reasonable factfinder could conclude that the CNYPC's bathroom and shower policies deprive the plaintiffs of the minimal civilized measure of life's necessities.[8] Accordingly, I recommend that plaintiffs' Fourteenth

---

[8] Additionally, although not dispositve of the inquiry, the CNYPC's resident bathroom policy was reviewed by the New York State Commission on Quality Care and Advocacy for Persons with Disabilities ("CQCAPD"), on request from the New York State Inspector General, and found it to be acceptable. Nowicki Decl. (Dkt. No. 27-4) at ¶ 27; Nowicki Decl. Exh. E (Dkt. No. 27-10). Based upon that review, the CQCAPD concluded that the CNYPC

> has a rationale [sic] and defensible argument for the creation of [the policy,] . . . which individuals identified by the treatment team as needing increased monitoring, will have a physician's order that they must enter one at a time to the bathroom on the treatment mall and/or the activity center. [Another of the CNYPC policies, entitled] Sex Offender Treatment Program Resident Rights[,] indicates that the patient rights includes that basic human needs will be met and residents' personal privacy is protected within the necessary constraints dictated by the need for safety and security.

Amendment due process claim be dismissed.

C.    Section 504 of the Rehabilitation Act

Plaintiffs also assert a claim under the section 504 of the Rehabilitation Act.  Complaint (Dkt. No. 1) at 30-31.  In their motion, defendants request dismissal of this claim, arguing that plaintiffs' complaint fails to state a claim upon which relief may be granted, and the individual defendants are immune from suit under the Eleventh Amendment.  Defs.' Memo. of Law (Dkt. No. 27-3) at 14-18.

1.    Failure to State a Claim Upon Which Relief May Be Granted

Because a court "may dismiss for failure to state a cause of action upon motion for summary judgment," it is necessary to set forth the legal standard governing Rule 12(b)(6).  *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *see also Katz v. Molic*, 128 F.R.D. 35, 39 (S.D.N.Y. 1989) ("Therefore, that a summary judgment motion is being treated as a motion to dismiss for failure to state a claim does not require notice to the parties.").

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial

───────────────────

Nowicki Decl. Exh. E (Dkt. No. 27-10) at 1.

sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at

678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and

alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

Turning to the legal authority governing plaintiffs' claims under the Rehabilitation Act, section 504 mandates that a person with a qualified disability may not be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with any program or activity receiving federal financial assistance.[9]  29 U.S.C. § 794; *see Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 216 (2d Cir. 2012).  Pursuant to section 504, "reasonable accommodations must be offered to ensure meaningful access to the [federally funded] program, [but] the statutes do not require that substantial changes be made to the program itself."  *Zahran ex rel. Zahran v. New York Dep't of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) (Hurd, J.) (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)).  To state a claim under section 504, a plaintiff's complaint must set forth allegations that

---

[9]    Specifically, section 504 provides, in relevant part, that

[n]o otherwise qualified individual with a disability . . . solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a).

plausibly suggest that (1) he is a person with a disability as defined under the Rehabilitation Act, (2) he has been denied the benefits of or excluded from participating in a federally funded program or special service, and (3) he was denied access based solely on his disability. *Bryant*, 692 F.3d at 216.

In this case, plaintiffs' section 504 claim arises from allegations that they have received inadequate vocational training while confined at the CNYPC. More specifically, they allege that they each meet the definition of "disabled" as it is defined in the Rehabilitation Act because they have "been diagnosed with a mental disability within the meaning of 29 U.S.C. § 705." Complaint (Dkt. No. 1) at 31. Plaintiffs' complaint also alleges that CNYPC residents "have the right to vocational training services[] that will enable them to live as independently as possible[, but that] . . . Defendants exploit [residents] for their labor[] by instituting workprograms that generates profits[,]"" *Id.* at ¶ 6. Finally, it is alleged that "[t]he violations of Plaintiffs' rights by Defendants include, but not limited to the failure of the CNYPC-SOTP to provide Plaintiffs with adequate and appropriate vocational training services, that benefits other recipients of public programs and services." *Id.* Accordingly, although this is far from clear, I have construed plaintiffs' Rehabilitation Act claim to encompass two components. First, they complain of being exploited by the alleged requirement

that they work in programs for the sole purpose of generating profits for the CNYPC.  The second aspect of the Rehabilitation Act claim challenges defendants' failure to provide adequate rehabilitative and vocational services.

The allegation that plaintiffs are forced to work while at the CNYPC is not cognizable under section 504.  It fails to plausibly suggest that they are denied access to the work program (assuming, without deciding, that it constitutes a federally funded program) based on a disability.  Instead, it is alleged that defendants *force* plaintiffs to participate in the work program for the benefit of the CNYPC, which is antithetical to a section 504 claim.[10]  Accordingly, I find that this allegation is insufficient to support a cognizable section 504 claim.

 Plaintiffs' second basis for asserting a claim under the Rehabilitation Act fails for similar reasons.  Assuming (without deciding) that plaintiffs satisfy the definition of disability under the Rehabilitation Act, none of the complaint's allegations plausibly suggest how defendants denied them access to the work program, or that they were denied access based on their disability.  Moreover,

_____

[10]     Plaintiffs' submissions in opposition to the pending motion could be regarded as asserting a retaliation claim, based upon their removal from the facility's work program following commencement of this suit.  Because it is clear that the defendants were dropped based upon their complaints of being subjected to forced labor, and that plaintiffs can request re-entry into the program at any time on a voluntary basis, it would be disingenuous for them to argue  that  adverse action has been taken against them, as required for a retaliation claim.

the allegation that "others" receive benefits that plaintiffs are denied due to their alleged disability is conclusory and unsupported by any other allegations in the pleading.  More specifically, plaintiffs fail to identify who the "others" are, or what benefits they receive that plaintiffs are denied.   Accordingly, I find that these allegations are also insufficient to support a cognizable section 504 claim, and recommend that the claim be dismissed.

> ## 2.     Eleventh Amendment Immunity

Because I find that plaintiff's section 504 claim fails to state a claim upon which relief may be granted, I will not address defendants' Eleventh Amendment immunity arguments.

> ## D.     Equal Protection

Liberally construed, plaintiffs' fourth claim for relief includes an equal protection claim arising under the Fourteenth Amendment.  Complaint (Dkt. No. 1) at 31.  While defendants have not challenged this cause of action, the court may, *sua sponte*, determine whether a plausible equal protection claim has been stated in light of plaintiffs' IFP status.  *See* 28 U.S.C. § 1915(e) ("[T]he court shall dismiss the case at any time if [it] determines that . . . the action . . . fails to state a claim on which relief may be granted[.]").

The equal protection clause of the Fourteenth Amendment directs state

actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).

In this instance, plaintiffs compare themselves to convicted state prisoners, and allege that state prisoners experience more favorable conditions than CNYPC residents. Complaint (Dkt. No. 1) at 31. Even assuming (without deciding) that the two groups – CNYPC residents that are civilly confined, and prison inmates penally confined – are similarly situated for purposes of an equal protection analysis, plaintiffs' complaint fails to allege facts that plausibly suggest any disparity in the conditions experienced by the two groups as a result of purposeful discrimination directed at an identifiable suspect class. *See Taylor v. New York State Dep't of Corr. Servs.*, No. 07-CV-1288, 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2001) (Mordue, J.) ("[S]ex offenders do not comprise a suspect or quasi-suspect class for equal protection purposes[.]"). Under a Rule 12(b)(6) analysis, it is not enough to conclusorily allege that plaintiffs experience housing conditions that are "substantially inferior" to those

of a state prisoner.  Complaint (Dkt. No. 1) at 31.  Such an allegation, on its own, does not provide defendants with adequate notice as to what conditions plaintiffs complain of, or how state prisoners experience more favorable conditions.  Accordingly, I recommend that plaintiffs' equal protection claim be dismissed.

      E.    Supplemental Jurisdiction

In the event this report is adopted, all of plaintiffs' federal cause of actions will be dismissed, and all that will remain are the claims asserted under the New York State Constitution and state law.  Under those circumstances, I would recommend that the court decline to exercise supplemental jurisdiction over the remaining state claims, pursuant to 28 U.S.C. § 1367.  *Stephenson v. Albany Cnty. Policymakers,* No. 09-CV-0326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

IV.    SUMMARY AND RECOMMENDATION

At the heart of plaintiffs' claims in this action is their challenge to new policies adopted at the CNYPC for those receiving sex offender treatment, governing the use of facility bathrooms and showers.  Because the policies were implemented due to legitimate security concerns of facility staff and residents, and result in only minimal inconvenience to plaintiffs, I recommend

dismissal of plaintiff's constitutional challenge to those policies.

Plaintiffs' complaint also asserts a claim of disability discrimination under section 504 of the Rehabilitation Act, based upon defendants' alleged failure to provide proper vocational and other training to the plaintiffs. The Rehabilitation Act, however, does not affirmatively mandate that programs be provided to the disabled but instead merely prohibits the denial of participation in programs and receipt of benefits based upon disability. Since plaintiffs have failed to identify any programs of which they have been denied based upon their alleged disability, their Rehabilitation Act claims are also subject to dismissal.

Plaintiffs' complaint, liberally construed, also asserts an equal protection claim against defendants. That claim, however, is subject to dismissal because plaintiffs have failed to allege facts plausibly suggesting that they have been treated differently than other, similarly situated individuals based upon intentional or purposeful discrimination directed toward an identifiable or suspect class. Based upon the foregoing, and my recommendation that the court not exercise supplemental jurisdiction over the remaining state law and state constitutional claims, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED, and that plaintiffs' complaint in this action be

DISMISSED in its entirety, without prejudice to their right to commence an action in a state court of competent jurisdiction.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     August 28, 2013
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report,
Recommendation and Order dated February 27, 2007
recommended

that defendants' motion for summary judgment
dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim
be DISMISSED in its entirety, and further that all
remaining claims be DISMISSED as against defendants
Goord, Roy, Plescia and Miller, but that it otherwise be
DENIED, and that the matter proceed with regard to

plaintiff's constitutional claims against defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the
Report-Recommendation. When objections to a magistrate
judge's Report-Recommendation are lodged, the Court
reviews the record *de novo. See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate [judge]. The
[Court] may also receive further evidence or recommit the
matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Peebles for the reasons stated in the
February 28, 2007 Report-Recommendation with one
modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 20] is **GRANTED in part and
DENIED in part.** Plaintiff's legal mail claim is
**DISMISSED in its entirety.** Further all remaining claims
against Defendants Goord, Roy, Plescia and Miller are
**DISMISSED.** The motion is denied with regard to
Plaintiff's constitutional claims against Defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility, but Defendants are
**granted leave to renew** the motion following a period of
discovery. Accordingly, Defendants may assert in their
renewed motion, should they decide to file one, that
Plaintiff failed to exhaust his administrative remedies by
failing to promptly file a grievance once at Groveland
Correctional Facility.

**IT IS SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*REPORT, RECOMMENDATION AND ORDER*

[DAVID E. PEEBLES](), U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to [42 U.S.C. § 1983]() to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

**\*2** In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]()

> [FN1.]() The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of

an affidavit for purposes of the pending motion. [28 U.S.C. § 1746 (1994)](); [Fed.R.Civ.P. 56(e)](); [*Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998)]() (citations omitted); [*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995)]() ; [*Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at \*5-\*6 & n. 2 (S.D.N.Y. Aug. 10, 1998)](); [*Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at \*4 n. 1 (S.D.N.Y. May 12, 1997).]() As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See* [*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).]()

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees, including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by

defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.[FN2] Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> FN2. Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July 22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Complaint (Dkt. No. 2) Exhs. 9, 17.

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness. [FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶¶ 5-6.

> FN3. DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal

mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.[FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.[FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> FN4. This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> FN5. Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e. g., Rashidi,* 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953).

> FN6. That rule provides, in relevant part, that
>
> [w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.
>
> Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius,* No. 05-CV-6021, 2006 WL 559253, at \*1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and, concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in connection with the pending motion. *See Rashidi,* 818 F.Supp. at 1355-56.

### B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

C. *Failure to Exhaust Administrative Remedies*

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

*8 The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently

available to him under the IGP.[FN8]

FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, had he done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez,* 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

> **FN9.** As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

> **FN10.** Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

1. *Availability Of Administrative Remedies*

**\*9** Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust. [FN11]

> FN11. It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*see also* *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be denied because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf.* *Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

*11 In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims

stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

### 2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

### IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Horace DOVE, Plaintiff,
v.
CITY OF NEW YORK, Venessa Williams, Staff on
Ward 53 at Kings County Hospital, The Patients on
Ward 53, Jewish Board Family & Children Services,
Owners of Maple Street Residence, Jeffrey Clarke,
Arlene Bishop, Esther, The Staff at Maple Street, Lionel
Young, and Abbot Laboratory of Illinois, Defendants.
No. 03-CV-5052 JFB LB.

March 15, 2007.
Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs.,
Corporation Counsel of the City of New York, Marc A.
Konowitz, Esq., New York State Attorney General's
Office, New York, NY, for Defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.
  *1 Pro se plaintiff Horace Dove ("Dove") brings this
action against the City of New York (the "City"), Vanessa
Williams ("Williams"), the staff on Ward 53 at Kings
County Hospital, and the patients on Ward 53
(collectively, "defendants"), alleging violations of
plaintiff's constitutional rights pursuant to 42 U.S.C. §
1983 and various state law claims.FN1 Specifically, plaintiff
alleges that, during his time as a patient at Kings County
Hospital (the "Hospital"), (1) the Hospital's policy or
custom of permitting patients to smoke in the Hospital
violated plaintiff's rights, (2) the Hospital's staff and
several patients conspired to assault plaintiff, and (3) the
Hospital's staff failed to protect plaintiff from assaults by
other patients on four separate occasions between June 9,
2002 and July 10, 2002.
    FN1. Defendants Jewish Board of Family &

Children Services, the owners of the Maple
Street Residence, Jeffrey Clark, Arlene Bishop,
Esther, the Staff at Maple Street, Lionel Young,
and Abbot Laboratory of Illinois are no longer
parties to this action.

  Defendants now move for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure.FN2 For the reasons that follow, defendants'
motion is granted.

    FN2. Plaintiff failed to serve the unidentified
    staff and patients named in the complaint. Thus,
    those defendants have not appeared in the instant
    action.

I. BACKGROUND

A. Facts
  Upon consideration of a motion for summary
judgment, the Court construes the facts in the light most
favorable to plaintiff, the non-moving party.FN3 See
Capobianco v. City of New York, 422 F .3d 47, 50 (2d
Cir.2005).
    FN3. Defendants submitted a statement, pursuant
    to Local Civil Rule 56. 1, which asserts material
    facts that they claim are undisputed in this case.
    Defendants also complied with Local Civil Rule
    56.2 by providing notice to plaintiff that he is not
    entitled simply to rely on allegations in his
    complaint, but is required to submit evidence,
    including sworn affidavits, witness statements
    and documents to respond to the motion for
    summary judgment, pursuant to Fed.R.Civ.P.
    56(e). (See Dkt. Entry # 84.) This action
    provided actual notice to plaintiff of the
    consequences of noncompliance with the
    requirements of Fed.R.Civ.P. 56. See, e. g., Irby
    v. N.Y. Transit Auth., 262 F.3d 412, 414 (2d
    Cir.2001) ("[W]e remind the district courts of
    this circuit, as well as summary judgment
    movants, of the necessity that pro se litigants
    have actual notice, provided in an accessible

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). Although plaintiff did not respond to defendants' Rule 56.1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Therefore, where the Court cites to defendants' Rule 56.1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre-Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006)* (deeming facts in defendants' Rule 56.1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56.2 and the court's review of the record did not reveal that there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005)* (deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56.2 and where plaintiff did not submit evidence controverting those

factual assertions).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment of mental health issues. (Dfts.' 56.1 ¶¶ 7-14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "Position Description" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56.1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (*Id.*)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56.1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (*Id.* ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (*Id.* ¶¶ 7, 9, 12.) On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (*Id.* ¶ 12; Compl. ¶ 29.) Plaintiff's claims arise out a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

### 1. Smoking in the Hospital

According to plaintiff, during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiff's room. (Compl.¶ 30.) The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (*Id.*) Plaintiff also alleges that he complained to the staff about other patients' smoking, but that the staff did nothing to stop the patients from smoking. (*Id.* ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (*Id.* ¶ 33.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

### 2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl.¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were warned of the attack in advance and "gave their approval." (*Id.* ¶ 38.) According to plaintiff's deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (*Id.*) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (*Id.,* Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

### 3. The Chair-Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiff's] head." (Compl.¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (*Id.* ¶ 44.) According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover, plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from assaulting him, but the staff did not tell the other patient to stop. (*Id.* ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another

patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (*Id.*) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (*Id.,* Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time. [FN4] (Hewson Decl., Ex. H.) Also, according to the Hospital's records, a psychiatrist evaluated plaintiff on July 2, 2002 and found that he continued to be delusional. (*Id.*)

> FN4. The Hospital's records also indicate that, on June 22, 2002-the alleged date of the chair-throwing incident according to plaintiff-members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

### 4. The June 27, 2002 Incident

**\*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl.¶ 46.) In response, according to plaintiff, Williams told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.) Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl.¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51-52.) Moreover, during his deposition, plaintiff confirmed that he had no

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G.)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Exs. F, H.)

5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day. (Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (Id., Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (Id.)

**\*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.¶ 84.) Upon arriving at Kingsboro,

plaintiff was given a full physical exam by a doctor. (Hewson Decl., Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (Id.)

B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

II. DISCUSSION

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Thus, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 37-39 (2d Cir.1986)); *accord Perez v. N.Y. Presbyterian Hosp.,* No. 05 Civ. 5740(LBS), 2006 WL 585691, at *3 n. 1 (S.D.N.Y. March 20, 2006).

## B. Plaintiff's Allegations

**\*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's "own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel,* No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at *10-* 11 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiffs] complaint or in her subsequent missives to the court"); *Ward v. Coughlin,* No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y.1995) (finding plaintiff's self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 275 F.Supp.2d at 475 (internal quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. *See Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,* No. 00 Civ.1910(SHS), 2006 WL 2792690, at *9 (S.D.N.Y. Sep. 27, 2006).

**\*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

injuries.[FN5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

> FN5. There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident. As discussed *supra,* the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent.

Finally, plaintiff's own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep. Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at

91-92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under *Jeffreys* because no reasonable juror could credit plaintiff's unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming *arguendo* that the smoking by other patients and all of the assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli, ---F.Supp.2d ----, 2007 WL 102073, at \*18 (S.D.N.Y.2007); Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at \*1 n. 1 (S.D.N.Y. Nov. 15, 2005).

D. Due Process Claims

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

**\*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir .1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *9 (S.D.N.Y. Sept. 20, 2005); *see also Fair v. Weibur,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov. 2, 2006). However, in this case, the complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process.[FN6]

> FN6. The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's remaining submissions to the Court-that is, other than his response brief-fail to allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Decl., Ex. G.) Accordingly, the Court declines to address any such claim at this time.

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at *3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324); *Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *8 (S.D.N.Y. Aug. 20, 2001) (citing *Youngberg,* 457 U.S. at 315-16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.")); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889-90 (8th Cir.2004) ("Because [plaintiff] was an involuntarily committed patient ... the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322-24; *see Vallen,* 2005 WL 2296620, at *9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *11 (S.D.N.Y. Aug. 15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL 2476440, at *8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision alleged to have caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323; *see Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

**\*8** Notably, however, the Court in *Youngberg*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg,* 457 U.S. at 323 n. 30; *see Kulak,* 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski,* 2004 WL 2476440, at *8; *see Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg,* only to a deliberate indifference standard."); *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen,* 2005 WL 2296620, at *9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen,* 2005 WL 2296620, at *9.

As the Second Circuit has observed:

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for

trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's constitutional rights or that a municipal policy or custom caused the alleged deprivations.

(i) Due Process Claims Against Williams

**\*9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54 .) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) For the reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46-49, 51-53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin,* 343 F.3d at 51 n. 17 ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)). Accordingly, plaintiff's claims against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired and or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff. In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

(ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108-9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)); *accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at *12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

**\*11** Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty Com'rs of Bryan Cty, Okl. v. Brown,* 520 U .S. 397, 405 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state." *Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480-81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17-503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[FN7] In addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

> FN7. Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17-503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. *See Sewell v. N.Y.C. Transit Auth.,* 809 F.Supp. 208, 217 (E.D.N.Y.1992) ("[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)).

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit,* 2006 WL 2381871, at *13, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. *See Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' ") (quoting *Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

### 2. Assaults on Plaintiff

**\*12** Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. *See Warheit,* 2006 WL 2381871, at *12 n. 4 (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff. Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to

intervene to protect plaintiff from such assaults. *See Vallen,* 2005 WL 2296620, at *11 (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that, *following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

**\*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

### E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999). Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York,* 985 F.2d 94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999).

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thorne,* 68 F.3d 547, 551 (2d Cir.1995).

### F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶ 1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50-e and 50-i. *See Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state law claims.

Sections 50-e and 50-i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the

claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See* N.Y. Gen. Mun. Law §§ 50-e, 50-I. "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at *22 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action." *Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at *3 (S.D.N.Y. April 19, 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151 (1988)).

**\*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at *19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e)(7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted.[FN8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at *5-*6 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s]' whose conduct has caused injury.").

FN8. Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern, which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. *See, e.g., Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at *9-*10 (S.D.N.Y. Sept. 30, 2002) (dismissing New York state statutory claims due to plaintiff's failure to file a notice of claim).

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

(Cite as: 2007 WL 805786 (E.D.N.Y.))

[plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121-22 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, *11 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

E.D.N.Y.,2007.

Dove v. City of New York
Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Barry Lee VALLEN Plaintiff,
v.
S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A.
Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson;
S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John
Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A.
Brown; S.H .T.A. Jones; and Various S.H.T.A. John
Does, Defendants.
No. 02 Civ. 5666(PKC).

Sept. 20, 2005.
*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant to 42 U.S .C. § 1983, alleging that he was the victim of multiple patient-to-patient assaults and deprivations of property during the time that he resided at the Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"), a facility operated by an agency of the state of New York. In a Memorandum and Order dated September 2, 2004, I dismissed defendants New York State Office of Mental Health and Mid-Hudson on the basis of the state's constitutionally-based immunity from suit. *Vallen v. Mid-Hudson Forensic Office of Mental Health,* 2004 WL 1948756 (S.D.N.Y. Sept. 2, 2004). I concluded that the Complaint set forth allegations sufficient to state claims against the individual defendants for deliberate indifference to confinement conditions that were seriously and dangerously unsafe. *Id.* at \*3. I held that plaintiff's claim did not arise under the Eighth Amendment because he was not serving a term of imprisonment pursuant to a conviction, but, generously construed, his *pro se* Complaint could be read as alleging that persons acting under color of state law had deprived him, as an involuntarily detained person, of rights protected by the Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants have moved for summary judgment dismissing the plaintiff's claims. For the reasons explained below, the defendants' motion is granted.

*Background*

The following facts are taken from plaintiff's pleadings, his sworn deposition testimony or are otherwise not disputed. Where multiple inferences can be drawn from the facts, I have considered only the one most favorable to Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of second-degree murder in connection with the death of his parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty by reason of mental illness or defect and was diagnosed as a paranoid-schizophrenic. (Vallen Dep. at 169-71) A Justice of the New York Supreme Court, Orange County, found that, at that point in time, the plaintiff suffered from a dangerous mental illness and ordered that he be committed to a psychiatric facility. (Vallen Dep. at 170) Subsequently, plaintiff was discharged to outpatient care on two occasions, but in each instance he was later recommitted. (Vallen Dep. at 172-84) From April 18, 1997 through June 14, 2000, plaintiff was an inpatient at Mid-Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B. Mukasey dismissed plaintiff's deprivation of property claim and ruled that the State of New York provided adequate post-deprivation remedies for the recovery of lost property. (July 22, 2002 Order at 3) He also ruled that the Complaint inadequately detailed the assault claims, and dismissed those claims without prejudice. (July 22, 2002 Order at 2, 4-5) Plaintiff filed an Amended Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment at Mid-Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

("SHTAs") who were responsible for assisting psychiatric patients in their day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

*2 Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,*

373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

*3 The defendants have served the *pro se* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a *pro se* party opposing a summary judgment motion. *See Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *pro se* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at *5 (S.D.N.Y. Aug. 20, 2003) (obligation to construe leniently *pro se*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

opposition papers on a summary judgment motion). However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at *9 (S.D.N.Y. Aug. 25, 2004).

*Discussion*

1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249-50 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *pro se* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *pro se* office on December 10, 2001. *See Ortiz v. Cornetta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. *See Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person

entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". *Id.* at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548-549. New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g., Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 18, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C)[FN1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack.[FN2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS).[FN3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *pro se,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf. Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

FN1. The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)

FN2. To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.

FN3. *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

**\*5** In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiff's Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has felt aggrieved.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City), 17 A.D.3d at 794; Assad, 238 A.D.2d at 457*. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid-Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid-Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that defendant John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219-20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*6** The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001.[FN4] The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the

plaintiff's action is dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *See Jute v. Hamilton Sanstrand Corp.,* Docket No. 04-3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

FN4. Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

2. *Lack of Showing of a Defendant's Personal Involvement*

The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (quoting *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)*).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)*. Liability may not be anchored in a theory of *respondeat superior. Collins v. City of Harker Heights, 503 U.S. 115, 122*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

(1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11-12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3.[FN5] (Vallen Dep. Tr. at 106-07) As such, his claims arising from this incident (No. 4) are dismissed.

> FN5. According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

*7 The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120-21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10-11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation. Cf. *Moncrieffe v.*

*Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity. (AC at 15-16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15-16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N., kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

from these three incidents (Nos.14-16) are dismissed as to all defendants.

3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

**\*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively

valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs.[FN6] In *Lewis,* the Court reasoned:

> [FN6.] In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates," ' including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

*Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

**\*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug. 20, 2001)* (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004).

However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same: no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89-96; AC at 9-10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants'

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

motion for summary judgment as to this incident (No. 2) is therefore granted.

**\*10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid-Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219-20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at \*4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain

patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4. *Qualified Immunity and Law of the Case*

**\*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

CONCLUSION

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

*APPENDIX TO MEMORANDUM AND ORDER IN VALLEN V. CARROL, 02 CIV. 5666(PKC)*

1. *Allegations Based on Events that Occurred During Plaintiff's First Few Months at Mid-Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid-Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219-20)

2. *The First Patient C.J. Allegation*

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89-91, 95-96; AC at 9-10)

3. *The Patient S.W. Allegation*

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9-10)

4. *The Second Patient C.J. Allegation*

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106-07)

5. *The Third Patient C.J. Allegation*

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near his eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120-21)

6. *The Fourth Patient C.J. Allegation*

**\*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

7. *The Patient A.A. Allegation*

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

8. *The Allegation Against SHTA Leper*

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

9. *The "Reshawn" Allegation*

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17)

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

(Cite as: 2005 WL 2296620 (S.D.N.Y.))

Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

10. *The Gantz Bathroom Allegation*

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples Aff., Exh. C, at 1)

11. *The SHTA March Bathroom Allegation*

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

12. *The SHTA Brown Allegation*

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

13. *The SHTA Malfatone Water Allegation*

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

14. *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

15. *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

16. *The Patient B. Bathroom Allegation*

**\*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238-39)

S.D.N.Y.,2005.

Vallen v. Carrol
Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan ODOM, Plaintiff,
v.
John P. KEANE; Sgt. M. Cooper; Sgt. Leghorn; Sgt. McClain; R.J. Colon; Officer K. Byrd, et al., Defendants.
No. 95 Civ. 9941(SS).

Sept. 17, 1997.

Jonathan Odom, pro se, Great Meadow Correctional Facility, Comstock, N.Y., for plaintiff.

Dennis C. Vacco, Attorney General of the State of New York, New York City, Michael B. Siller, Ass't. Attorney General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

*1 Plaintiff, Jonathan Odom, currently incarcerated at Comstock Correctional Facility, brings this action pro se under 42 U.S.C. § 1983, asserting that defendants violated his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. Complaint at ¶ 5. The gravamen of the Complaint concerns plaintiff's allegations that on July 10, 1995, while incarcerated at Sing Sing Correctional Facility, he was housed in an unsanitary cell without a working toilet. Plaintiff also contends that chronic plumbing problems in the cell resulted in the toilet not flushing between the hours of 9:00 p.m. and 7:00 a.m. over a period of two months. Plaintiff seeks monetary damages and injunctive relief. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56(b). Plaintiff has opposed defendants' motion and cross-moved for summary judgment. For the reasons set forth below, defendants' motion for summary judgment is **granted;** plaintiff's cross motion for summary judgment is **denied,** and the case is **dismissed** in its entirety.

**BACKGROUND**

On July 10, 1995, plaintiff was placed in cell number K–197 (now called K–21S). The toilet in the cell was not working. A block plumber repaired the toilet several hours after plaintiff reported the problem. Plaintiff also alleges that the cell was filthy and that he was forced to clean it himself with soap and his personal belongings. Finally, plaintiff contends that even after the toilet was fixed, toilet did not function between the hours of 9:00 p.m. and 7:00 a.m. from July 10, 1995 through September 1995. Plaintiff charges that these cell conditions "resulted in the plaintiff suffering actual damages including, but not limited to, vomiting and being deprived of sleep due to the nauseous smell coming from his cell toilet all night long, causing him to be having migraine headaches, injury to plaintiff, is pain and suffering and mental anguish." Complaint at ¶ 20.

Plaintiff also contends that he made numerous unheeded complaints about the malfunctioning toilet to the defendants and other prison authorities. First, plaintiff asserts that he informed Correction Officer Byrd, assigned to K–Gallery, about the problem. Plaintiff contends that defendant Byrd refused to cooperate because plaintiff would not acquiesce to defendant Byrd's numerous attempts to extort cigarettes from plaintiff. Plaintiff also alleges that he submitted inmate grievances on different occasions that detailed his problems with the cell's plumbing and defendant Byrd, but that prison authorities ignored his grievances.

Plaintiff submits as exhibits to his complaint a copy of an inmate grievance complaint dated July 14, 1995, a copy of a follow-up memorandum dated August 4, 1995, regarding the status of his grievance; a memorandum dated September 14, 1995 to John Keane, Superintendent and Sergeant M. Cooper regarding the malfunctioning cell plumbing; an inmate grievance complaint dated September 15, 1995, and a memorandum dated September 21, 1995, to Governor Pataki, Philip Coombe, Brian Malone and John Keane detailing allegations of "unprofessional" behavior by defendant Byrd and complaining about the malfunctioning plumbing.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

**\*2** Defendants strongly dispute that they had notice of plaintiff's plumbing problems. Defendants agree that plaintiff's toilet was not operating on July 10, 1995, the day that plaintiff moved into the cell. In addition, they do not dispute that the cell was dirty. However, defendants contend, and plaintiff concedes, that Correction Officer Byrd dispatched a plumber to plaintiff's cell and that the toilet was repaired within several hours. Byrd Affidavit at ¶ 7. At plaintiff's request, the Court has personally reviewed the Complaint Log in K Block used between July 10 and September 30, 1995 and found one plumbing related entry for inmate K 197, presumably by plaintiff. The July 30, 1995, entry reads: "12:05 pm called about K197 O.I.C. McCarthy aware of plummbing (sic) difficulties."

Defendants also contend, despite plaintiff's assertions and documentary proof to the contrary, that plaintiff never submitted a grievance to prison officials concerning the continued malfunctioning of the toilet. In support of their position, they argue that extensive discovery has yielded no record of complaints. Assistant Attorney General Pamela M. McLaughlin avers that she conducted two searches for "documents from the Sing Sing Correctional Facility pertaining to any instance regarding plaintiff's claims of faulty plumbing or an unsanitary cell from July to September of 1995," that "turned up nothing." McLaughlin Aff. at ¶ 8. Ms. McLaughlin has also provided the Court a computer print out enumerating the grievances filed by plaintiff during this relevant period. *See* Notice of Motion, Exhibit C. The print out indicates that from 1993 through 1996 plaintiff submitted over 57 grievances, none of which concerned plumbing problems in plaintiff's cell. In his Affidavit, Correction Officer Byrd claims that, other than the initial complaint, "he received no further complaints from plaintiff regarding his toilet or other plumbing facilities."

On October 12, 1995, Deputy Commissioner Wayne Strack responded to plaintiff's September 21, 1995 memorandum stating:

Superintendent Keane has conducted an investigation into your allegation of unprofessional behavior at Sing Sing and has advised me that no evidence was found to

substantiate your claim. It was reported that you are constantly begging staff for cigarettes. The plumbing problem in your cell was repaired as soon as the block plumber became available. In the future, address your complaints at the facility level by contacting your area supervisor.

Defendants also dispute plaintiff's allegations of retaliation or extortion. Defendants point out that in a July 2, 1995 deposition, plaintiff characterized the acts of defendant Byrd as "not really retaliatory." Tr. at 9. Defendants also assert that plaintiff filed suit against defendant Byrd because of personal animosity toward this defendant unrelated to this action. As evidence, defendants note that plaintiff conceded that defendant Byrd "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." Tr. at 9.

## THE STANDARD OF REVIEW: DISMISSAL UNDER FED.R.CIV.P. 56(b)

**\*3** Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the

initial responsibility ... of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When deciding a motion for summary judgment, this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). Where, as here, a party is proceeding pro se, this Court also has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169 (2d Cir.1995). However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995). Rather, to overcome a motion for summary judgment, the non-moving party must provide this Court with some basis to believe that his or her "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Thus, in determining whether to grant summary judgment, this Court must determine (i) whether a factual dispute exists based on the evidence in the record, and (ii) whether, based on the substantive law at issue, the disputed facts are material.

### DISCUSSION

Defendants raise three grounds for dismissal: first, they argue that plaintiffs allegations are insufficient to prove a constitutional violation; second, defendants contend that plaintiff's claims of retaliation are wholly conclusory; and third, defendants assert that the complaint should be dismissed as to all defendants because of their lack of personal involvement. I discuss only defendants' first and second grounds for dismissal as my resolution of these grounds in defendants' favor obviates the need to reach defendants' personal involvement argument.

### THE EIGHTH AMENDMENT AND CRUEL AND UNUSUAL PUNISHMENT

**\*4** Plaintiffs claim is governed by the Eighth Amendment which prohibits cruel and unusual punishment. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To prevail on an Eighth

Amendment claim, prisoners must satisfy a two prong test.

The objective prong of *Wilson* asks whether the seriousness of the prison condition rises to an unconstitutional level. In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently to form the basis of an Eighth Amendment violation." *Id.;* (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).) Although the Constitution " 'does not mandate comfortable prisons,' " *Wilson,* 501 U.S. at 297, "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989). The subjective prong of the *Wilson* test requires that defendants act with a state of mind evincing "deliberate indifference" to an inmate's health or safety. *Wilson,* 502 U.S. at 301. Pursuant to this standard, prison officials must know of, and disregard, an excessive risk to inmate health and safety. *Id.* at 1979. While the Eighth Amendment requires state prison officials to maintain "humane conditions of confinement," including adequate food, clothing, shelter and medical care, *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), conditions of confinement implicate the Eighth Amendment only when they exceed "contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir.1994).

Here, plaintiff presents the Court with three distinct Eighth Amendment claims concerning his prison conditions. The first and second claims arose on July 10, 1995, when plaintiff was placed in a cell that (1) was unsanitary, and (2) did not have a working toilet. The third claim relates to the alleged malfunctioning of the toilet during the two month period. The first two claims are insufficient to establish an Eighth Amendment violation because of the very short time these conditions existed and were endured by plaintiff. Indeed, both of these conditions were rectified by the end of the day. It is undisputed that defendants quickly repaired the toilet when plaintiff first complained that it was broken. Defendants' same day response belies plaintiff's assertion that his complaints fell on deaf ears. Plaintiff acknowledges that he cleaned his cell himself on July 10, 1995, using soap and personal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

clothing. Complaint at ¶ 9. While an unsanitary cell may be deplorable, plaintiff has failed to allege a violation of constitutional magnitude. Similarly, the several hours plaintiff was without a working toilet does not rise to the level of cruel and unusual punishment. *Hutto,* 437 U.S. at 678 (conditions, such as a filthy cell, may "be tolerable for a few days and intolerably cruel for weeks or months."), *see also Miller v. Glanz,* 948 F.2d 1562, 1569–70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours); *Harris v. Fleming,* 839 F.2d 1232, 1235–36 (7th Cir.1988) (plaintiff "experienced considerable unpleasantness" for five days due to "filthy, roach-infested cell").

**\*5** Plaintiff's claim that his toilet did not flush between the hours of 9:00 p.m. and 7:00 a.m. for a period of several months also fails to state a constitutional violation. "[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment...." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (5th Cir.1994). Although it is difficult to fathom how one toilet flushing mechanism, and not all of the flushing mechanisms on one water line, could malfunction on a regular basis only between the hours of 9:00 p.m. and 7:00 a.m., this condition does not amount to cruel and unusual punishment. While I have no doubt that such a situation would be patently offensive to plaintiff, the fact that plaintiff was made uncomfortable by the stench, these conditions in and of themselves do not sustain a constitutional claim. *See Rhodes,* 452 U.S. at 347 (inconvenience is considered a part of the penalty criminal offenders pay for their offenses against society). Plaintiff's toilet functioned approximately twelve hours every day, time enough to dispose of plaintiff's bodily wastes. Plaintiff makes no assertion that he risked contamination by contact with human waste.

Plaintiff has failed to prove the objective component of his claim, as required by *Wilson.* It is unnecessary to reach the subjective component of *Wilson* because, without a constitutional violation, defendants clearly could not have acted with "deliberate indifference."

**RETALIATION AND CONSPIRACY**

In a claim unrelated to plaintiff's malfunctioning toilet, plaintiff alleges that defendant Byrd retaliated against him by denying him food and water because plaintiff failed to "support [Byrd's] cigarette." Complaint at ¶ 13. Plaintiff reiterated this allegation in his opposition to defendants' motion for summary judgment. *See* Plaintiff's Memorandum in Opposition at ¶ 10. [FN1]

> FN1. In his memorandum in opposition to the defendants' motion for summary judgment, plaintiff contended, for the first time:
>
>> that these defendants as prison officials had conspired to concoct false allegations, deprived him of fair hearings, and subjected him to disciplinary action (April 13, 1994 to January 1, 1996) as reprisal in retaliation for his prior lawsuits against officers, agents, servants, and employees employed at Sing Sing Correctional Facility.
>
> Plaintiff's Memorandum in Opposition at ¶ 18. Plaintiff repeats this new allegation of retaliation in a letter dated August 20, 1997, which he has sent to the Court requesting that the Court listen to a tape of a superintendents' hearing held on July 8, 1997. The Complaint before this Court is limited to claims about the malfunctioning toilet and defendant Bryd. Plaintiff's new allegations relate to a "Corrections Officer named Michael Stormer", who is not a defendant in this action, and retaliation because plaintiff was "complaining of being denied to be issued supplies and cell clean up while in S.H.U." Plaintiff's Letter of August 20, 1997. Thus, Plaintiff's letter and the new allegations in his memorandum of law relate to matters outside the scope of the Complaint before the Court. This Court, therefore, does not address these allegations.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), (*citing Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). Nevertheless, "because we recognize

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." *Colon,* 58 F.3d at 871, (*citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)*). A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996), (*citing In Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and substantive safeguards available to other litigants. *Colon,* 58 F.3d at 872. "[A] retaliation claim supported by specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13; *accord Colon,* 58 F.3d at 872.

**\*6** Here, plaintiff has failed to present any facts that defendant Byrd acted to deny plaintiff food or water or otherwise retaliate against him. Plaintiff admitted at his deposition that the acts of defendant Byrd were "not really retaliatory" and that defendant Byrd had "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." In addition, defendant Byrd has submitted an affidavit in which he avers, "I would like the Court to know that I have no disciplinary files related to filing a false misbehavior report or false and misleading statement in a grievance or hearing." Despite plaintiffs assertions of "false charges" and "disciplinary action," plaintiff does not provide the Court with any indication that he was actually subject to such discipline by defendant Byrd. Any retaliation claim regarding plaintiffs plumbing problems must be dismissed because, as previously discussed, plaintiff has failed to allege the violation of an underlying constitutional right. *See Colon,* 58 F.3d at 872.

Claims of retaliation must be examined with skepticism and care. *Flaherty,* 713 F.2d at 13. Broad and unsubstantiated allegations of retaliation will not defeat a motion for summary judgment. *Id.* Plaintiff has not set forth any facts that evidence an agreement or understanding between defendant Byrd and any other defendant to retaliate against him. Plaintiff's argument that he has been effectively prevented from producing such evidence by the defendants' refusal to comply with discovery is unavailing. By Order dated March 19, 1997, I found that "the McLaughlin Affidavit responds fully to the Court's discovery order of January 23, 1997" and noted that "[d]efendants cannot produce documents they claim do not exist." Plaintiffs retaliation and conspiracy claims are dismissed in their entirety.

**CONCLUSION**

For the reasons set forth above, plaintiff's cross motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED** in its entirety. The Clerk is directed to enter judgment for defendants dismissing the Complaint in its entirety.

**SO ORDERED.**

Dated: New York, New York September 15, 1997

S.D.N.Y.,1997.

Odom v. Keane
Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))



Only the Westlaw citation is currently available.
United States District Court,

D. Vermont.
David McGEE, Plaintiff,
v.
Andrew PALLITO, Robert Hofmann, Kurt Kuehl,
Robert McDougall, Marie Salem, Robert Kupec, Kevin
Oddy, Phil Fitzpatrick, Brian Reed, Cindy Modiano,
Mary Ellen Cross, Richard Byrne, David Talcott, Greg
Hale, Tim Harrington, Philip Brochu, Phillip Quijano,
Joseph Sylvestri, Marshall Rich, David Martinson,
Michael Bellizzi, Scott Morley, Anita Carbonell, Ellen
McWard, Dominic Domato, Mark Potanas, Christina
Granger, James Kamel, Joshua Rutherford, Michael
Arace, James Edwards, Monique Sullivan, Correctional
Officer Simmons, Correctional Officer Camp, Delores
Burroughs–Biron, M.D., Nurse Manager Doe, Nurse(s)
Doe, and Prison Health Service, Inc., Defendants.
Civil Action No. 1:10–CV–11.

Aug. 3, 2011.
David McGee, Beattyville, KY, pro se.

Jana M. Brown, Megan J. Shafritz, Vermont Office of the
Attorney General, Montpelier, VT, for Defendants.

**REPORT AND RECOMMENDATION** (Docs. 58, 62,
79 and 82)

JOHN M. CONROY, United States Magistrate Judge.

**\*1** Plaintiff David McGee, a Vermont inmate
proceeding *pro se,* claims that his constitutional rights
have been violated in several respects during the course of
his incarceration. Specifically, his 116–page Complaint
alleges denial of basic sanitation; retaliatory transfers;
denial of adequate clothing and shelter; denial of
prescription medications; retaliatory destruction of legal
materials; and systematic deprivations of personal
property. Defendants have moved to dismiss the
Complaint, arguing that McGee fails to allege facts that

rise to the level of unconstitutional conduct, and that with
respect to certain Defendants, he has failed to establish
sufficient personal involvement in the alleged wrongdoing.
In addition, the State of Vermont Defendants contend that
they are entitled to qualified immunity and sovereign
immunity.

For the reason set forth below, I recommend that the
motions to dismiss be GRANTED in part and DENIED in
part.

*Factual Background*

McGee is a self-described "experienced inmate
litigator who believes in using the law and court system to
hold prison officials accountable for their past misconduct
and to discourage them from future abuses." (Doc. 71 at
1.) In the instant case, he brings thirteen separate causes of
action. The Court will not recount all of the factual
allegations set forth in his 846–paragraph Complaint, but
will instead summarize his claims. For the limited purpose
of ruling on the pending motions to dismiss, the facts
alleged in the Complaint are accepted as true.

In Count 1, McGee claims that for a period of time
while incarcerated at Vermont's Northwest State
Correctional Facility ("NWSCF"), he was barred from
using the restroom more than once every two hours during
the night. On at least one occasion, he was denied
immediate access to a restroom and had to urinate into his
coffee mug. He was subsequently informed that he
suffered from an enlarged prostate that could cause him to
urinate frequently. McGee now claims that the "two-hour
rule" violated his constitutional rights.

Count 2 alleges a retaliatory transfer. As part of civil
litigation initiated by McGee in state court, Assistant
Attorneys General Kurt Kuehl and Robert McDougall
noticed his deposition. Because the deposition was
scheduled to be taken at a facility in South Burlington, and
McGee was being housed out of state, a prison transfer
was required. McGee claims that during his time at the
out-of-state facility, he "had acquired a great deal of
personal property not allowed in Vermont prisons, had a
prison job, and lived in an 'honor dorm.' " (Doc. 7 at ¶

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

134.) He therefore filed an objection to the deposition notice under Vermont Rule of Civil Procedure 30(a), which provides that inmate depositions "may be taken only by leave of a Superior Court judge on such terms as the judge prescribes," and proposed that the deposition be conducted via telephone. Before the state court could rule on his objection, however, he was transferred to Vermont.

**\*2** As a result of his transfer, McGee was allegedly deprived of his legal materials. He also claims that once in Vermont, he was subjected to further transfers within only a few days and "under harsh conditions." (*Id.* at ¶ 183.) His legal claim is that "[t]he temporal proximity between Plaintiff's legal activities and his transfer from Kentucky to Vermont for a deposition that was not authorized by the superior court ... establishes a direct causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff by Defendants." (*Id.* at ¶ 184 .)

Count 3 alleges that McGee was denied seasonally-appropriate clothing for a period of time. He claims that without proper clothing, he was exposed to sub-freezing temperatures when accessing the cafeteria and other prison buildings, could not participate in outdoor recreation, and became ill. Count 3 also claims that while he was incarcerated at the Chittenden Regional Correctional Facility ("CRCF"), Department of Corrections ("DOC") officials would not allow him to keep the string that held up his sweatpants.

Count 4 claims that during a 24–hour "lockdown drill," water to all cells was turned off for approximately 20 hours. Inmates were provided one eight ounce cup of milk with breakfast, and eight ounce cups of Kool–Aid with lunch and dinner. McGee was also provided a four ounce cup of water in the mid-afternoon. He now claims that due to an intestinal condition, he became constipated and later suffered painful bowel movements. He also alleges that without flushable toilets, toilets in the cells and the common bathrooms emitted noxious odors that made him sick, and that "exposed raw human excrement constituted a biohazard." (*Id.* at ¶ 267.)

Count 5 is another retaliatory transfer claim, again arising out of civil litigation initiated by McGee in state

court. Jury selection was scheduled, but was "effectively canceled" after the parties submitted summary judgment motions. (*Id.* at ¶ 313.) McGee alleges that, notwithstanding the cancellation, AAG Kuehl requested the DOC's out of state unit to transfer McGee back to Vermont for jury selection. The transfer itself caused McGee great physical discomfort. Once he arrived in Vermont, he was allegedly deprived of adequate bedding and clothing, lost some of his personal property, had fewer privileges than those he had been enjoying while incarcerated out of state, and when he inquired as to the reason for the transfer, was allegedly told that the DOC was "just yanking [his] chain." (*Id.* at ¶ 349.)

Count 6 alleges a third retaliatory transfer. In this instance, McGee claims that he was transferred from CRCF to Southern State Correctional Facility ("SSCF") in retaliation for filing a series of grievances. At SSCF, he was forced to sleep on the floor due to overcrowding. Overcrowding also required him to spend part of his time at SSCF in segregation. While in segregation, McGee was allegedly denied all personal property, was allowed out of his cell one hour per day, and could not go outside.

**\*3** In Count 7, McGee asserts that he was denied adequate shelter, and that the conditions at SSCF constituted cruel and unusual punishment. Part of his time at SSCF was spent in a small intake unit known as the "fishtank." McGee claims that inmates in the fishtank were forced to sleep on dirty mattresses on the floor, with only a thin cotton blanket and no sheets. With six or seven inmates in the fishtank at one time, the mattresses abutted each other, and inmate blankets often touched other mattresses or the floor. There was one toilet and one sink, access to hygiene items (toothbrush, soap, etc.) only once per day, and no other property allowed. Because of prison overcrowding, the fishtank was used as a regular living unit. McGee claims that he spent four days in the fishtank.

Count 7 further alleges that McGee was placed in a "punitive/administrative segregation unit" due to overcrowding. When he returned to general population, he had to sleep on the floor because of a lack of available bunks. He claims that his mattress was on the floor, and that the mattress and linens were "frequently covered with ants, as the ground floor cells were regularly infested ."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

(*Id.* at ¶ 397.)

Count 8 claims that while confined in the fishtank, McGee and other inmates had to use a toilet that could be viewed by female correctional officers. Although there was a private inmate restroom in the building unit, some, though not all, correctional officers barred fishtank inmates from using it. McGee asserts that this conduct by DOC employees denied him his limited right to bodily privacy.

Count 9 alleges that for a period of seven days, McGee was denied a "normal" toothbrush, and was instead provided a "small, plastic, 'thimble-like' tool." (*Id.* at ¶¶ 418–19). McGee claims that the tool was not effective for cleaning teeth, was unsanitary because it forced him to put his fingers inside his mouth, and caused him pain. He states that he was given the tool while in a disciplinary segregation cell, but that he had been placed in the cell due to prison overcrowding, and not because of any disciplinary issues.

Count 10, which alleged denial of access to legal materials, has been dismissed by the parties with prejudice. (Doc. 68.)

Count 11 claims a systematic denial of medications in violation of the Eighth Amendment. McGee alleges that he suffers from a variety of medical conditions, including: environmental allergies; back and knee pain; intestinal pain and bleeding; and migraine headaches; as well as depression, bipolar, and anxiety disorders. He claims that he was prescribed numerous medications for these conditions, and that several were allowed to expire or were "wrongfully discontinued" on three separate occasions, "causing Plaintiff to go without the medications for, at times, over a week." (Doc. 7 at ¶ 489.) He contends that medications were discontinued by non-prescribers (*e.g.* "SSCF Nurse Doe"), and that one such non-prescriber was doing so without the prescribers' permission in order "to save money." (*Id.* at ¶ 496.) McGee also claims that there was a policy of discontinuing medications when inmates missed doses, but that some of his medications were to be taken only on an "as needed" basis, and should not have been discontinued. (*Id.* at ¶¶ 494, 502.)

**\*4** Count 12 claims that in the course of a transfer from SSCF back to Kentucky, several of McGee's legal documents were intentionally mishandled and/or destroyed. The documents allegedly pertained to grievances and a lawsuit McGee had brought against SSCF for mishandling his personal property. McGee contends that "[t]he temporal proximity of Plaintiff's grievances and property claims against SSCF staff to the actual destruction of his property and legal materials ... infers a direct causal connection" between the alleged destruction and "Plaintiff's protected conduct of filing grievances and lawsuits." (*Id.* at ¶¶ 566–67.)

Count 13, which alone consists of 195 paragraphs of facts, claims that McGee was systematically denied his personal property without due process. McGee summarizes his claim as follows, alleging that various DOC officials and employees should be held liable for:

(1) allowing any staff unfettered discretion in taking inmate personal property; (2) failing to provide inmates with receipts or notice when taking possession of or confiscating inmates' property; (3) using incorrect lists of allowed property when transferring inmates between correctional facilities; (4) sending inmate personal property to third-parties without the inmateowner's authorization; (5) failing to hold due process hearings after confiscating inmate property and before permanently dispossessing the inmate-owner of the property; (6) failing to inform the inmate-owner of, and failing to document, the "final disposition" of inmate property before destroying or disposing of it; (7) unreasonably delaying inmates' receipt of their personal property during transfers between correctional facilities; (8) unreasonably withholding and delaying the transfer of inmates' allowable personal property without legitimate penological justification; (9) dispossessing those inmates who are temporarily returned to Vermont from [out-of-state] facilities for legal proceedings of their [out-of-state] allowable property; and (10) general and widespread mishandling of and disregard for inmate personal property that results in manifestly predictable losses, withholding, and damage.

(*Id.* at ¶ 764.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

The Complaint seeks injunctive relief on some claims, and declaratory and monetary relief on all claims. McGee asserts federal constitutional claims, pursuant to 42 U.S.C. § 1983, as well as state law claims over which he asks the Court to assert supplemental jurisdiction under 28 U.S.C. § 1367.

Defendants are past or present employees of the State of Vermont, with the exception of Prison Health Services, Inc. ("PHS") and two Nurse Does. The State Defendants, except for Correctional Officer Simmons (who has not been served), have moved to dismiss all claims. (Doc. 59.) PHS asserts that it is only named in Count 11, and therefore moves to dismiss that Count, incorporating into its motion the arguments set forth by the State Defendants. The motions are submitted pursuant to Fed.R.Civ.P. 12(b)(6).

### *Discussion*

**I. Motion to Dismiss Standard**

**\*5** In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the Complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechlis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). Furthermore, pleadings drafted by a *pro se* party should be liberally construed. *See Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right of relief above the speculative level.' " *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir.2010) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Thus, McGee must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 129 S. Ct 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556).

**II. Conditions of Confinement Claims (Counts 1, 3, 4, 7 and 9)**

Defendants first challenge McGee's conditions of confinement claims. Those claims are brought under the Eighth Amendment. The Eighth Amendment prohibits cruel and unusual punishment that involves the unnecessary and wanton infliction of pain. *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981). Relevant to McGee's conditions of confinement claims, the Eighth Amendment imposes a duty on prison officials to provide humane conditions, and to ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

In order to prevail on an Eighth Amendment claim, a plaintiff must satisfy both an objective and subjective component. First, the deprivation must be, from an objective perspective, sufficiently serious, such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* at 834 (citing *Rhodes,* 452 U.S. at 347); *see also Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted) (minimal civilized necessities include "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety."). The second component requires that the prison official have a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834. In cases such as this, that state of mind is one of deliberate indifference to the health and safety of an inmate. *Id.*

### A. "Two Hour Rule" (Count 1)

In Count 1, McGee claims that Correctional Officers imposed a "two hour rule," meaning that inmates could not use the restroom more than once every two hours between 10 p.m. and 6 a.m. As a result, McGee once had to urinate in his coffee cup. He also claims that he was denied drinking water between these hours, and that when allowed to use the restroom, he was not allowed to wash his hand with soap. Defendants contend that these allegations "fall so far short of the mark as to be *de minimis.*" (Doc. 59 at 14.)

**\*6** Although persons in custody have no constitutional right to use the bathroom whenever they please, *see, e.g., Odom v. Keane,* 1997 WL 576088, at *4–5 (S.D.N.Y. Sept. 17, 1997),* "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs...." *Whitnack v. Douglas County,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

16 F.3d 954, 958 (8th Cir.1994). Courts have generally found, however, that a temporary deprivation of bathroom facilities does not rise to the level of an Eighth Amendment violation. *See, e.g., Jones v. Marshall,* 2010 WL 234990, at *3 (S.D.N.Y. Jan. 19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of an Eighth Amendment claim"); *Rogers v. Laird,* 2008 WL 619167, at *3 (N.D.N.Y. Feb. 8, 2008) (noting that "[t]he temporary deprivation of restroom privileges for a three hour period does not constitute an extreme deprivation of life's necessities"); *Bourdon v. Roney,* 2003 WL 21058177, at *1 1 (N.D.N.Y. Mar. 6, 2003) (three hour deprivation of bathroom privileges did not constitute Eighth Amendment violation); *Qawi v. Howard,* 2000 WL 1010281, at *3–4 (D.Del. July 7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Whitted v. Lazerson,* 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (holding that an inmate's Eighth Amendment rights were not violated when he was occasionally prevented from using the restroom and thus urinated or defecated on his clothing); *Odom,* 1997 WL 576088, at *4 (finding that the absence of a working toilet in an inmate's cell for several hours "does not rise to the level of cruel and unusual punishment").

McGee argues that Defendants' case citations are distinguishable because he was deprived of bathroom access regularly and as a matter of policy. He compares his situation to that in *Shariff v. Coombe,* 655 F.Supp.2d 274, 298–300 (S.D.N.Y.2009), a case brought by wheelchair-bound inmates. The plaintiffs in *Shariff* testified that they had urinated and defecated on themselves several times per week, and had at times suffered injuries trying to use handicap-inaccessible bathrooms. While the court did note that cases involving one-time denials of bathroom access were distinguishable, its analysis focused on the injuries suffered: "The sheer frequency with which these incidents occur—not to mention the physical injuries that at least some Plaintiffs have suffered in attempting to use an inaccessible restroom—indicates that Plaintiffs have been denied 'the

minimal civilized measure of life's necessities' in violation of the Eighth Amendment." *Shariff,* 655 F.Supp.2d at 298. McGee's injury—the fact that he was forced to urinate into a cup—was far less serious, and thus distinguishable from the facts in *Shariff.*

**\*7** Furthermore, even assuming that McGee could show that having to wait two hours between bathroom visits was sufficiently serious under the Eighth Amendment, the Complaint does not allege deliberate indifference to a health risk. *See Farmer,* 511 U.S. at 834. On the one alleged occasion that McGee was forced to urinate into a coffee mug, he awoke in the middle of the night and an officer did not respond to his calls for approximately twenty minutes. (Doc. 7 at ¶¶ 81–92.) McGee now alleges that he had an enlarged prostate, but does not suggest that his condition was, or should have been, known to the Correctional Officer on duty. While the wait was undoubtedly uncomfortable, the officer's alleged action—effectively ignoring McGee's calls while "chatting" on the internet—did not amount to the sort of deliberate indifference to an excessive risk of harm that runs afoul of the Eighth Amendment. *See Vacca v. Scott,* 119 F. App'x 678, 679 (5th Cir.2005) (finding that, although plaintiff averred that defendants acted with deliberate indifference in denying him access to a bathroom, at most he alleged that he suffered generalized pain and discomfort, which is insufficient to state an Eighth Amendment violation).

**B. Denial of Drinking Water (Count 1)**

Count 1 of the Complaint also alleges that McGee was denied drinking water between 10 p.m. and 6 a.m. McGee does not allege that he was denied access to drinking water outside of ordinary sleeping hours, and the Eighth Amendment does not require access to drinking water at all times. *Mortimer Excell v. Fischer,* 2009 WL 3111711, at *5–*6 (N.D.N.Y. Sept. 24, 2009); *Bolin v. Rice,* 2000 WL 342676, at *5 (N.D.Cal. Mar. 30, 2000) ("As long as an inmate's meals included a beverage, the temporary denial of drinking water presents no constitutional issue.") (citing *Tesch v. County of Green Lake,* 157 F.3d 465, 475–76 (7th Cir.1998)). Accordingly, to the extent that McGee was denied drinking water during the night, there was no constitutional violation.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

## C. Inability to Wash Hands with Soap (Count 1)

McGee further alleges that after urinating in his cell he could not wash his hands immediately, and that only later was he allowed rinse his hands without soap.[FN1] These claims fall far short of alleging an Eighth Amendment violation. *See, e.g., Harris v. Fleming,* 839 F.2d 1232, 1234–36 (7th Cir.1988) (holding that prisoner did not state a claim when prison officials negligently deprived him of soap, toothbrush, and toothpaste for ten days); *Fernandez v. Armstrong,* 2005 WL 733664, at *5 (D.Conn. Mar. 30, 2005) (denial of hygiene items, including soap, for sixteen days did not allege a violation of Eighth Amendment rights); *Fisher v. Dep't of Corr.,* 1995 WL 608379, at *5 (S.D.N.Y. Oct. 16, 1995).

> FN1. McGee does not allege that he was denied soap entirely, but instead that he was not allowed to take soap with him to the bathroom. (Doc. 7 at ¶ 96.)

Because none of the claims set forth in Count 1 of the Complaint rise to the level unconstitutional conduct, I recommend that Count 1 be DISMISSED.

## D. Inadequate Clothing (Count 3)

**\*8** Defendants also argue for dismissal of Count 3, in which McGee alleges that he was denied adequate clothing. McGee was transferred from Kentucky to SSCF in Vermont in 2007, and claims that he was not provided any clean clothing during the two and a half days he spent at SSCF. He was then transferred to CRCF, but was "unable to have any street clothing sent into him because his family in Vermont, who had Plaintiff's clothing, was [out of state] in Connecticut caring for a sick relative." (Doc. 7 at ¶ 202.) As a result, McGee did not receive clean clothing during the five and a half days he was held at CRCF. (*Id.* at ¶ 205.)

After CRCF, McGee was housed at NSCF. He claims that the temperatures outside "ranged from 0 to only the low teens," and that although he had no winter jacket, he needed to walk outside each day to reach "NSCF's cafeteria, medical, and education/recreation buildings, which are separate from the living units." (*Id.* at ¶ 209.) McGee's underclothes arrived from Kentucky one month after his transfer, but he still lacked a warm outer layer. A few weeks later, he received a $50 money order from his

family, but was unable to buy a winter coat from fellow inmates. His family ultimately sent him a package of clothing approximately three months after his transfer from Kentucky. (*Id.* at ¶ 229.) McGee claims that he complained to prison officials and filed grievances about his clothing situation, but received no relief.

McGee also claims that prison officials forced him to either cut out a string that held up his sweatpants, or remain naked. He alleges that he chose to go naked rather than have his clothing "destroyed," and that he remained naked for two days before being placed in general population. (*Id.* at ¶¶ 244–48.)

McGee's allegations regarding a lack of clean clothes again fall short of stating plausible constitutional violations. Specifically, his claims that he was denied clean clothing, first for two and a half days at SSCF, and then during a five and half day stay at CRCF, do not state Eighth Amendment claims. *See McCorkle v. Walker,* 871 F.Supp. 555, 557 (N.D.N.Y.1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); *Chavis v. Fairman,* 1995 WL 156599, at *5 (3d Cir. Apr. 6, 1995) (court found no violation where inmate was forced to wear same uniform for three weeks); *Roberts v. Dep't of Corr.,* 1996 WL 526779, at *4 (N.D.Ill. Sept. 12, 1996) (holding that where inmates were forced to wear the same set of clothing for thirteen days, "such a short period of time without a change of clothing is nothing more than a temporary inconvenience and hardly rises to the level of the unnecessary and wanton infliction of pain."). Similarly, his allegation that he had to wear the same clothes for a significant period of time while at NSCF does not rise to the level of a constitutional violation. [FN2] (Doc. 7 at ¶¶ 206, 215, 229); *see Chavis,* 1995 WL 156599, at *5; Moss v. DeTella,* 1997 WL 24745, at *2 (N.D.Ill. Jan. 16, 1997) (holding that lack of clean clothes and bedding for 111 days did "not rise to the level of a constitutional violation"); *Coughlin v. Sheahan,* 1995 WL 12255, at *3 (N.D.Ill. Jan. 12, 1995) (allegation that inmate was provided only one change of clothing in a three-month period did not support Eighth Amendment claim).

> FN2. McGee concedes that "laundry services were available." (Doc. 71 at 32.) He also

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

contends in his opposition memorandum that he was "forced to wear the same set of indoor clothing for nearly four months." (*Id.* at 31.) The Complaint, however, alleges that he was transferred from Kentucky to Vermont on January 9, 2007, that "several changes of underclothes" arrived from Kentucky on February 9, 2007, and that he "finally received a package of clothing from his family" on April 12, 2007. (Doc. 7 at ¶¶ 196, 215, 229.) Therefore, at most, McGee did not have a change of outer layers for approximately three months.

**\*9** McGee's claims regarding exposure to cold weather, however, are sufficient to survive Defendants' motion to dismiss. Exposure to extreme cold as a result of the denial of adequate winter clothing can provide a basis for finding that an Eighth Amendment violation has occurred. *See Corselli v. Coughlin,* 842 F.2d 23, 27(2d Cir.1988); *Wright v. McMann,* 387 F.2d 519 (2d Cir.1967). Indeed, "[a]dequate clothing is one of the necessities of life which prison officials cannot deprive an inmate." *Gordon v. Faber,* 800 F.Supp. 797, 800 (N.D.Iowa), *aff'd,* 973 F.2d 686 (8th Cir.1992); *see also Davidson v. Coughlin,* 920 F.Supp. 305, 309 (N.D.N.Y.1996) (holding that defendants had failed to show at summary judgment "how the clothing issued is sufficiently suitable for the harsh winter climate of upstate New York"); *Balla v. Idaho St. Bd. of Corr.,* 595 F.Supp. 1558, 1575 (D.Idaho 1984) (providing prisoners with clothing that is "patently insufficient to protect them from cold winter months" is a violation of the Constitution). Factors to be considered with regard to an alleged denial of adequate cold weather clothing include the length of exposure and temperatures experienced. *See, e.g. Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001).

Here, McGee's allegation of enduring several weeks in the middle of a Vermont winter without a coat or other adequate clothing, and of the failure of prison officials to help him remedy the situation, states a claim under the Eighth Amendment. Although short periods of exposure may not have been unconstitutional, the record thus far does not establish the length or frequency of McGee's exposures as he traveled from building to building at NSCF. *See Koehl v. Bernstein,* 2011 WL 2436817, at * 18

(S.D.N.Y. June 17, 2011) (no Eighth Amendment violation where inmate did not have appropriate clothing for outside recreation). Because the Complaint alleges a significant period of time in which McGee had inadequate clothing during the winter, the Court should decline to dismiss this claim under Rule 12(b)(6) for lack of plausibility.

Finally, Defendants argue that McGee chose not to wear his sweatpants rather than have the string removed. McGee contends that his choice was between the destruction of his clothing and having to go naked. The Court has found no case law directly on point, aside from the general principle that privacy interests of an inmate must be balanced with legitimate security interests of the institution. *See, e.g., Canedy v. Boardman,* 16 F.3d 183, 185–87 (7th Cir.1994). Because Defendants have not completely briefed whether the choice presented to McGee amounted to a constitutional violation, or whether there was a legitimate penological reason for denying him the string to his sweatpants, the Court should not dismiss McGee's claim at this time.

**1. Personal Involvement**

**a. Legal Standard**

Because I am not recommending dismissal of Count 3 in its entirety, I must consider Defendants' personal involvement arguments. Defendants Kupec, Hofmann, Martinson and Pallito, all of whom are named because of their roles as supervisors, contend that the Complaint does not allege facts that would render them liable under § 1983.[FN3] Before the Court undertakes a personal involvement analysis, it must determine the appropriate legal standard, as the standard for supervisor liability under § 1983 has been a matter of debate since the Supreme Court's decision in *Ashcroft v. Iqbal. See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (collecting cases).

> FN3. Other Defendants named in Count 3, for whom no such argument is made, include Defendants Fitzpatrick, Brochu and Quijano.

**\*10** In *Iqbal,* the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... [§ ] 1983 suits, a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. at 1948. The Supreme Court explicitly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949. Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

Prior to *Iqbal,* Second Circuit precedent provided for supervisor liability not only where the supervisor was directly involved, but also where he or she had been made aware of misconduct and had failed to take corrective action. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability could also attach where a supervisor had created policies or customs that allowed for, or resulted in, unconstitutional practices. *Id.* Specifically, *Colon* held that supervisor liability "may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

Post-*Iqbal,* lower courts in this Circuit have had to determine whether all of the *Colon* factors remain good law. In some instances, consistent with the *Iqbal* holding, courts have held that a supervisory defendant cannot be held liable under § 1983 unless that defendant actively deprived the plaintiff of his or her constitutional rights. *See, e.g., Newton v. City of New York,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("passive failure to train claims pursuant to § 1983 have not survived the Supreme Court's recent decision in [*Iqbal* ]"). Recent decisions have generally been careful to note, however, that *Iqbal* involved equal protection and discrimination claims, each of which require proof of discriminatory intent. *See, e.g.,*

*Plair v. City of New York,* 2011 WL 2150658, at *4 (S.D.N.Y. May 31, 2011)* (citing *Iqbal,* 129 S.Ct. at 1948). Indeed, the Supreme Court held that a supervisor's "mere knowledge of his subordinate's *discriminatory purpose* " does not amount to a constitutional violation. *Id.* at 1949 (emphasis supplied). The Supreme Court also allowed that "the factors necessary to establish a [constitutional] violation will vary with the constitutional provision at issue." *Id.* at 1948. Several courts in this Circuit have therefore retained the traditional *Colon* factors for claims that do not involve discriminatory intent. *See, e.g., Jackson v. Goord,* 664 F.Supp.2d 307, 324 n. 7 (S.D.N.Y.2009) (holding that *Colon* standard is unaffected by *Iqbal* in deliberate indifference case, because *Iqbal* "involved discriminatory intent.").

**\*11** Defendants argue that the *Colon* factors did not survive *Iqbal,* and that instead the Court should look only at (1) whether the supervisor directly participated in the violation, or (2) whether the supervisor created a custom or policy under which the violation occurred. (Doc. 59 at 11–12.) For support, they cite *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *4, *6 (S.D.N .Y. June 26, 2009), *Joseph v. Fischer,* 2009 WL 3321011, at * 14 (S.D.N.Y. Oct. 8, 2009), and *Newton,* 640 F.Supp.2d at 448. However, "[s]ubsequent decisions have noted that *Bellamy, Joseph, Newton,* and similar rulings may overstate *Iqbal's* impact on supervisory liability," and have instead held that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Plair,* 2011 WL 2150658, at *5 (citing *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009); *D'Olimpio,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010); *Qasem v. Toro,* 737 F.Supp.2d 147, 151 (S.D.N.Y .2010) (declining to adopt the "narrow interpretation of *Iqbal* " advanced by *Bellamy, Joseph* and *Newton* ).

Given the language in *Iqbal* cautioning courts to examine "the constitutional provision at issue," 129 S.Ct. 1948, this Court should follow this latter line of cases, and should not discard the *Colon* factors where the claim does not require a showing of discriminatory intent. As the *Sash*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

decision noted, "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected [in *Iqbal* ] the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." 674 F.Supp.2d at 544. Where a claim does not require a showing of discriminatory intent, "the *Colon* analysis should still apply, insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Delgado v. Bezio,* 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (quoting *Qasem,* 737 F.Supp.2d at 151–52).

### b. Personal Involvement Alleged in Count 3

In Count 3, McGee does not assert the sort of intentional discrimination presented in *Iqbal.* Instead, he claims deliberate indifference in violation of the Eighth Amendment. Courts in this Circuit have generally applied the five *Colon* factors to such a claim. *See Plair,* 2011 WL 2150658, at *4 ("other judges in the Second Circuit have continued to cite all five of the *Colon* categories as the bases for establishing supervisory liability in cases alleging violations of a plaintiff's Fourth and Eighth Amendment rights").

Defendants first argue that McGee has not alleged sufficient personal involvement on the part of Defendant David Martinson, the Assistant Superintendent at NSCF. The allegation against Martinson is that, after Defendant Quijano's investigation concluded that no further action was needed with regard to the clothing issue, Martinson concurred and denied McGee's Grievance # 2. (Doc. 7 at ¶¶ 234–35.) There is no suggestion in the Complaint that Martinson did anything aside from merely affirming the denial. It also appears from the Complaint that Martinson issued the affirmance after McGee had received additional clothing from his family. (*Id.* at ¶¶ 229, 235).

**\*12** "[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing *Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal

involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (citations omitted). Furthermore, to the extent that courts have found affirmance of a grievance to constitute personal involvement, many of those cases have involved ongoing violations. *See Thomas v. Calero,* 2011 WL 1532058, at *14, *17 (S.D.N.Y. Mar. 17, 2011) (collecting cases, and noting "uncertainty in the law" on this point). Here, the fact that McGee had received his clothing by the time Martinson issued a response to the grievance means that there was no ongoing violation, at least with respect to McGee while housed at Martinson's facility (NSCF). The Court should therefore find that the minimal allegations against Defendant Martinson are insufficient to establish his personal involvement.

McGee's allegations against Defendant Kupec, the Facilities Executive at the DOC Central Office, and former DOC Superintendent Hofmann, are that they each responded to his grievance appeals in writing, characterizing his claims as "meritorious in part." (Doc. 7 at ¶¶ 230, 237.) Defendant Kupec also allegedly wrote that he was "sorry" and that "inmates in [McGee's] circumstances should have an alternative to remaining in the same clothing, day in, day out." (*Id.* at ¶ 231.) Despite their agreement with at least some of McGee's claims, Kupec and Hofmann allegedly failed to remedy what McGee claims was a continuing, and problematic, practice in DOC and out-of-state prisons: providing clothing to inmates in some facilities and sending their personal clothing to relatives or into storage, and then upon a prison transfer, requiring those same inmates to provide their own clothing.

Based upon these allegations, the Court should find that Kupec and Hofmann were both directly involved in the grievance process, and were not merely "rubber-stamping" an administrative denial. *See Woodward v. Mullah,* 2009 WL 4730309, at *3 (W.D.N.Y. Dec. 7, 2009); *Charles v. N.Y. State Dep't of*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

*Corr. Servs.,* 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (drawing a distinction between a supervisor who simply affirms the denial of a grievance and a supervisor who "receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint") (citing *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007)). Defendants argue that under the *Bellamy* and *Joseph* reasoning, mere knowledge of a violation is insufficient. (Doc. 59 at 17.) For the reason discussed above regarding the appropriate legal standard, those limited readings of *Colon* should not be applied here, and the motion to dismiss Defendants Kupec and Hofmann from Count 3 should be DENIED.

**\*13** Finally, Defendants' argument for the dismissal of current DOC Commissioner Pallito from Count 3 is misplaced. Personal involvement is required for an award of damages under § 1983. *Farrell,* 449 F.3d at 484. In Count 3, however, McGee is only seeking injunctive relief from Defendant Pallito. (Doc. 7 at ¶ 803); *see Hall v. Marshall,* 479 F.Supp.2d 304, 318 (E.D.N.Y.2007). The motion to dismiss Defendant Pallito from Count 3 for lack of personal involvement should therefore be DENIED.

### E. Conditions during Lockdown Drill (Count 4)

Defendants next move to dismiss McGee's fourth cause of action, in which he complains of his prison conditions during a lockdown drill. McGee focuses on the lack of running water during the lockdown, but concedes that he was given eight ounce drinks at breakfast, lunch and dinner, and a four ounce drink in the mid-afternoon. As discussed above, so long as inmates are provided drinks at mealtimes, temporary deprivations of drinking water are not unconstitutional. *See, e.g., Mortimer Excell,* 2009 WL 3111711, at *5–*6; *Bolin,* 2000 WL 342676, at *5; *Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals).

McGee's fourth claim also alleges that because the water was shut off, he could not flush his toilet and was therefore exposed to unsanitary conditions. Courts facing similar, and in some instances more egregious, facts have denied relief under the Eighth Amendment. *See Smith v.*

*Copeland,* 87 F.3d 265, 269 & n. 3 (8th Cir.1996) (finding no violation when prisoner was confined to cell with overflowed toilet for four days); *Odom,* 1997 WL 576088, at *4–5 (lack of a working toilet in prison cell for approximately 10 hours "does not rise to the level of cruel and unusual punishment"). In *Smith,* the Eighth Circuit commented that not every "overflowed toilet in a prison amounts to a constitutional violation." 87 F.3d at 268. The court noted that "the length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis," and that cell conditions that "may be tolerable for a few days are intolerably cruel for weeks or months." *Id.*

Here, the lockdown drill lasted twenty-four hours, and water was shut off for twenty hours. McGee claims that "noxious odors from the unflushable toilets became so amassed and severe they escaped the confines of individual cells and permeated entire buildings." (Doc. 7 at 35.) His claims, however, do not approach the sort of extended deprivations that have been found to violate the Eighth Amendment. *See, e.g., Gaston,* 249 F.3d at 166 (exposure to raw sewage "for days on end" stated viable Eighth Amendment claim). McGee's allegations of unconstitutional conditions during the lockdown drill should therefore be DISMISSED.

### F. "Fishtank" Confinement (Count 7)

**\*14** Defendants next attack McGee's claims in Count 7, in which he alleges that he was confined in the "fishtank" with a group of other prisoners for four days. As set forth above, his claims are that the cell was crowded, the bedding was thin and dirty, access to personal hygiene items was limited to once per day, and ants crawled onto his bedding. Again, the relatively short duration of McGee's exposure to such conditions undermines the viability of his claims. *See Hutto v. Finney,* 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright,* 387 F.2d at 526 ("civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

paper for a substantial period of time, *i.e.,* 33 days); *Mahase v. City of New York,* 2000 WL 263742, at *6 (E.D.N.Y. Jan. 5, 2000)* (noting that "short-term confinement under unsanitary or uncomfortable conditions, without more, typically does not amount to a constitutional violation").

While the conditions in the "fishtank" may have been both crowded and arguably unsanitary, a four-day stay in such conditions does not violate the Constitution. *See, e.g., White v. Nix,* 7 F .3d 120, 121 (8th Cir.1991) (eleven-day stay in unsanitary cell not unconstitutional); *Harris v. Fleming,* 839 F.2d 1232, 1235–36 (7th Cir.1988) (five-day stay in filthy, roach-infested cell is not of sufficient duration for a constitutional violation). Similarly, restricting access to hygiene items to once per day during this four-day period did not amount to denial of McGee's constitutional rights. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for approximately two weeks—while perhaps uncomfortable" did not violate Eighth Amendment); *Davidson v. Murray,* 371 F.Supp.2d 361, 372 (W.D.N.Y.2005) (finding that an Eighth Amendment violation was not established, based upon conditions "amount[ing] to no more than occasional or temporary deprivations of personal hygiene items, with no ... indicat[ion] that plaintiff suffered any 'specific deprivation of a single human need' ..., or other accompanying harm") (citation omitted); *Fernandez v. Armstrong,* 2005 WL 733664, at *5–6 (D.Conn. Mar. 30, 2005)* (up to 16–day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

Finally, McGee's allegations of ants on his bedding are insufficient to state a constitutional violation, particularly when there is no accompanying allegation of harm or injury. *See, e.g, Summerville v. Faciuna,* 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009)* (no Eighth Amendment claim where plaintiff failed to "point to any evidence suggesting that [defendant] acted with reckless indifference to Plaintiff's health and safety by allowing him to be exposed to bugs."); *Davidson,* 371 F.Supp.2d at 370* ("Nothing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."); *Govan v. Campbell,* 289 F.Supp.2d 289, 296–97 (N.D.N.Y.2003) (holding that cockroach problem in cells

did not rise to level of a constitutional violation); *Wilson v. Schomig,* 863 F.Supp. 789, 794–95 (N.D.Ill.1994) (allegations that the plaintiff's "cell contained dirt, dust and roaches, and that his ceiling leaked during rainstorms" are "not sufficiently serious" to violate the Eighth Amendment). I therefore recommend that Count 7 be DISMISSED for failure to state a plausible constitutional claim.

**G. Inadequate Toothbrush (Count 9)**

**\*15** Defendants further move for dismissal of Count 9, in which McGee alleges that he was issued a special toothbrush for one week while housed in segregation. He describes the toothbrush as "a small, plastic, 'thimble-like' tool...." (Doc. 7 at ¶ 419.) He claims that the tool was unsanitary because it forced him to put his fingers inside his mouth, that it would sometimes slip out of his hands and cause him to gag, and that it "gouged the insides of Plaintiff's cheeks, causing lacerations, severe pain, bleeding and lasting sores." (*Id.* at ¶ 423.) In *Johnson v. Goord,* 12 F. App'x 22 (2d Cir.2000), the Second Circuit faced an apparently-similar claim, in which New York inmates complained about "dangerous toothbrushes" that "caused bleeding from their mouths and gums." While the lower court dismissed for failure to exhaust administrative remedies, the Second Circuit concluded that the inmates' claims were frivolous, and thus subject to dismissal under 42 U.S.C. § 1997e(c)(1).

McGee alleges that he was forced to use this "tool" for approximately one week. Courts in this Circuit have held that denying an inmate access to a toothbrush for such a short period of time does not violate the Eighth Amendment. *See Trammell,* 338 F .3d at 165 (deprivation of toiletries, other than toilet paper, for two weeks does not violate Eighth Amendment); *Fernandez,* 2005 WL 733664, at *5* (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights); *Chavis v. Kienert,* 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005)* (denial of toiletries for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety)).

McGee does not claim that he was denied any toiletries or teeth-cleaning devices whatsoever. Instead, he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

claims that the special toothbrush he was issued for a one-week period caused him discomfort and bleeding, and was arguably unsanitary. As the case law above makes clear, a complete deprivation for four days would not have violated the Constitution. Consequently, provision of a cleaning tool, though allegedly inadequate, also cannot violate the Constitution. I therefore recommend that Count 9 of the Complaint be DISMISSED.

### III. Medical Care Claim (Count 11)

In Count 11, McGee claims that several of his medications were either allowed to expire without automatic renewal, or were wrongfully discontinued, "causing Plaintiff to go without the medications for, at times, over a week." (Doc. 7 at ¶ 489.) McGee's alleged medical conditions included "environmental allergies; back & knee pain; intestinal pain & bleeding; migraine headaches; and depression, bipolar, & anxiety disorders." (*Id.* at ¶ 488.) He claims that, because of the regular discontinuation of his medications, "he suffered pain and degeneration of his medical and mental health conditions, which interfered with his daily activities." (*Id.* at ¶ 491.)

**\*16** In order to state an Eighth Amendment claim regarding health care while in prison, an inmate must again satisfy both objective and subjective components. Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). The Second Circuit has characterized the necessary level of suffering as that which would produce death, degeneration or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006).

There can be little doubt that McGee's claims satisfy the subjective portion of the deliberate indifference standard. The Second Circuit has made clear that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005) (citing *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express

instructions of a prisoner's doctors.")). The allegation that medications were discontinued for financial purposes also suggests a state of mind that could plausibly amount to deliberate indifference. *See Chance v. Armstrong,* 143 F.3d 698, 704 (2d Cir.1998) (the "allegation of ulterior motives [*i.e.,* monetary incentives], if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment.").

Consequently, Defendants move to dismiss on the basis of the objective prong, arguing that the alleged delays in McGee's medications were not sufficiently serious to establish an Eighth Amendment claim. They also argue that, with regard to McGee's allegations of harm, his claims of "pain and degeneration" lack sufficient detail. In *Iqbal,* the Supreme Court cautioned that a complaint must include more than "a formulaic recitation of the elements." 129 S.Ct. at 1951. By citing "degeneration" and "pain," McGee is merely echoing the requirements for the objective prong of the Eighth Amendment standard. *See Hathaway,* 99 F.3d at 553. The Complaint does not set forth any specific claims about which of his many ailments were impacted, or the physical manifestations of his alleged "degeneration" and "pain."

In his opposition memorandum, however, McGee provides additional details about his pain and suffering. With regard to his mental health ailments, he claims that his missed medications "resulted in Plaintiff's depression, anxiety, and bipolar disorder severely worsening: Plaintiff grew depressed and withdrawn, had anxiety attacks, and turned into a 'shut in' unable to leave his cell due to the distress." (Doc. 71 at 70.) Physical symptoms allegedly included severe migraine headaches and intestinal bleeding. (*Id.* at 71.) Such claims may be sufficiently serious to satisfy the Eighth Amendment standard. *See, e.g., Mahan v. Plymouth Cty. House of Corr.,* 64 F.3d 14, 16–18 (1st Cir.1995) (severe depression and anxiety attacks); *DeJesus v. Albright,* 2011 WL 814838, at \*9 (S.D.N.Y. Mar. 9, 2011) (migraine headaches).

**\*17** While a court generally may not look beyond the pleadings when considering a motion to dismiss under Rule 12(b)(6), "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997); *see also Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009) (holding that requirement of reading *pro* se submissions generously "makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.") (citations omitted). Here, McGee's opposition memorandum includes additional allegations of serious medical harm, sufficient to withstand the motion to dismiss.

The Court must therefore again turn to the question of personal involvement. Although several Defendants are named in Count 11, the only personal involvement argument is presented on behalf of Commissioner Pallito. Specifically, Defendants argue that Commissioner Pallito cannot be held liable because he merely affirmed denial of McGee's grievance. (Doc. 59 at 23.) The Complaint, however, alleges the Pallito both received and investigated the grievance, (Doc. 7 at ¶ 505), and in his opposition memorandum, McGee states that Pallito himself wrote that he had received the grievance, and that he concurred with his medical staff. (Doc. 71 at 73) ("Specifically, Defendant Pallito stated, in part, 'I have received your Appeal regarding your medication ... Please be advised that I concur with Dr. Burroughs–Biron's findings, a copy of which I have attached.' ") McGee also claims that the problems with his medications were ongoing, and the Commissioner failed to remedy the problem. Given these allegations, I recommend that the motion to dismiss Defendant Pallito for lack of personal involvement be DENIED.

### IV. Access to Courts Claim (Count 10)

Defendants next move to dismiss Count 10, in which McGee claims that he was denied access to his legal materials, and thus denied his constitutional right to access the courts. Since the Defendants filed their motions, this claim has been dismissed by the parties with prejudice. (Doc. 68.)

### V. Retaliation Claims (Counts 2, 5, 6 and 12)

### A. First Alleged Retaliatory Transfer (Count 2)

McGee also alleges several instances of retaliation. As discussed previously, Count 2 alleges that after he filed a lawsuit in Vermont, McGee was wrongfully transferred from Kentucky to Vermont for a deposition. McGee claims that the prison conditions in Vermont were less favorable than those to which he had become accustomed in Kentucky, and that the transfer denied him access to his legal files for a period of time. The deposition was initially postponed after McGee's successful challenge in state court, was rescheduled, was suspended upon McGee's own motion, and was never concluded. McGee alleges in Count 2 that "he was transferred from Kentucky back to Vermont, not for the legitimate purpose of a deposition, but as pretext for the true purpose of retaliation for filing a lawsuit and to deliberately disrupt his ability to litigate ." (Doc. 7 at ¶ 182.)

**\*18** "[P]rison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In order to establish a claim of retaliation for the exercise of a constitutional right, McGee must show (1) that he engaged in constitutionally protected conduct, and (2) that the conduct was a substantial motivating factor for "adverse action" taken against him by Defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citations omitted). The Second Circuit has also cautioned that claims of retaliation are "easily fabricated," "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," and that they must therefore be supported by nonconclusory allegations. *Bennett,* 343 F.3d at 137 (citation omitted).

In support of his retaliation claim, McGee alleges that Assistant Attorney General Kuehl, who was both opposing counsel in the state court litigation and the one who allegedly requested the prison transfer, stated during a telephone conversation that he could "transfer Plaintiff wherever he wanted," and that McGee did not " 'have any

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

rights.' " (Doc. 7 at ¶ 140–41.) McGee also claims that Kuehl scheduled the deposition so as to interfere with his ability to file a dispositive motion in the state court case. In sum, he claims that the timing of his transfer, "as well as Defendant Kuehl's statement in relation to the deposition and transfer," demonstrate a causal connection between protected activity and the actions taken by Defendants. (*Id.* at ¶ 184.)

Accepting McGee's allegations as true, his claims nonetheless fail to state a plausible claim. Attorney Kuehl noticed McGee's deposition in a case that was initiated by McGee himself. The case was brought in Vermont, and McGee should have reasonably expected that he would need to appear here for depositions or other proceedings. His deposition was scheduled, and it necessarily required a transfer from the facility in Kentucky. While a deposition by telephone or video might have been an option, Attorney Kuehl was not required to agree to such an alternative, and the fact that Kuehl required an in-person deposition does not lead to an inference of retaliation.

The timing of the deposition does not support McGee's claim, as scheduling a deposition near the end of discovery, and thus near the deadline for dispositive motions, is not unusual. Indeed, there is an "obvious alternative explanation" for the fact and timing of McGee's transfer from Kentucky, aside from any claim of retaliation. *Iqbal,* 129 S.Ct. at 1951–52.[FN4] Finally, any alleged statements by Attorney Kuehl about his ability to transfer an inmate, or the extent of an inmate's rights, while arguably inappropriate, do not bolster McGee's claim that the transfer was retaliatory. I therefore recommend that Count 2 be DISMISSED.

> FN4. Furthermore, if McGee's transfer improperly interfered with his ability to litigate, and he suffered prejudice as a result, he could potentially bring an access to courts claim. *See Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001).

**B. Second Alleged Retaliatory Transfer (Count 5)**

**\*19** Count 5, which alleges a second retaliatory transfer, presents an arguably stronger claim. In Count 5, McGee alleges that on February 12, 2009, a court clerk scheduled jury draws in two of his state court cases. The draws were to be held on April 15, 2009, unless the parties moved for summary judgment prior to February 28, 2009. Both parties subsequently moved for summary judgment prior to the deadline, thereby "effectively cancel[ing] the Apr. 15, 2009 jury draws." (Doc. 7 at ¶ 313.)

On April 5, 2009, McGee, who was being housed in Kentucky at the time, was informed that he was being returned to Vermont. McGee suspected that the transfer was due to the jury draws, and showed Kentucky officials a copy of a court order canceling the draws. Efforts to reach DOC staff in Vermont were unsuccessful, and McGee was placed on the transport bus. McGee now claims that DOC staff deliberately declined to respond to calls from Kentucky prison officials prior to his transfer. He also claims that the transfer denied him access to his legal materials, thus interfering with his ability to litigate, and that the prison conditions upon his arrival in Vermont were unconstitutional.

McGee further claims that Attorney Kuehl "had effective notice that the jury draws had been canceled over a month earlier when the parties had filed summary judgment motions, and that transferring Plaintiff back to Vermont was completely unnecessary." (*Id.* at ¶ 342.) He claims that Defendant Kevin Oddy, who worked in the DOC's out-of-state office, also received notice of the canceled jury draws in a fax from Kentucky prison officials dated April 6, 2009—presumably the day of McGee's transfer. Finally, McGee alleges that when he discussed the issue of his transfer with "a Department executive staff person," he was told that the DOC was " 'just yanking your chain.' " (*Id.* at ¶ 349.)

Defendants contend that a transfer from Kentucky to Vermont is not an adverse action, citing case law for the proposition that transfers between facilities with the same level of security are not "sufficiently adverse." (Doc. 59 at 30) (citation omitted). The Complaint makes clear, however, that the conditions of McGee's confinement when he arrived in Vermont were more severe than those he had experienced in Kentucky, and that Defendants were aware of those differences.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

Defendants also argue that by characterizing the jury draws as "effectively canceled," McGee is admitting that they were not *actually* canceled. (*Id.* at 30–31.) The Complaint alleges, however, that McGee showed a prison official in Kentucky "a copy of the superior court's order canceling the court hearing." (Doc. 7 at ¶ 320.) Accepting McGee's allegations as true, the Court must reject Defendants' argument on this point.

In sum, Count 5 essentially claims that Defendants ordered an unnecessary transfer. A causal link may be inferred from the statement of an un-named DOC official that the Department was intentionally "yanking" McGee's "chain." The Court should therefore find that Count 5 states a plausible retaliation claim.

**\*20** Three Defendants—Salem, Kupec, and Pallito—assert that they were not personally involved in the events alleged in Count 5. The Complaint alleges that Kupec and Pallito reviewed, investigated and denied McGee's grievance. In his opposition memorandum, McGee asserts that Pallito gave him a detailed response in excess of 150 words. These allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6).

As to Defendant Salem, the allegation is that as director of the DOC legal division, she was grossly negligent in her supervision of Defendant Kuehl. (Doc. 7 at ¶¶ 354–55.) Gross negligence by a supervisor is the fourth *Colon* factor. 58 F.3d 873; *see also Reid v. Bezio,* 2011 WL 1577761, at \*7 (N.D.N.Y. Mar. 30, 2011) (assuming, without deciding, that *Colon* factors apply to retaliation claim). However, McGee offers no facts to support his claim. Specifically, he fails to assert that Salem "had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act." *Merriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989). Such allegations are necessary for liability to attach under § 1983. *See, e.g., Smith v. Dep't of Corr.,* 2007 WL 678549, at \*4 (D.Conn. Mar. 1, 2007). The motion to dismiss Count 5 with respect to Defendant Salem should therefore be GRANTED.

**C. Third Alleged Retaliatory Transfer (Count 6)**

McGee's third retaliatory transfer claim, set forth in Count 6, alleges that he was transferred from CRCF to SSCF after filing a series of grievances. When Defendant Richard Byrne, a living unit supervisor at CRCF, informed Defendant Greg Hale, the superintendent at CRCF, that McGee's claims raised "valid issues," Hale's alleged response "was to ask how soon Plaintiff could be transferred to another facility." (*Id.* at ¶ 361.) One day after Byrne's conversation with Hale, McGee was transferred to SSCF. McGee claims that the conditions at SSCF were "grossly overcrowded," and that as a result he spent nearly four days in the "fish tank" and an additional eight days "in segregation under punitive conditions." (*Id.* at ¶ 366.)

McGee's filing of grievances represented protected activity. *See Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citation omitted). Further, the Second Circuit has held that transfers to other facilities or housing units can, under certain circumstances, satisfy the adverse action requirement. *See Davis,* 160 F.3d at 920 (transfer from one state prison facility to another constituted an adverse action). However, this is not such a case, as it is not apparent from the Complaint whether Defendant Hale was aware that McGee would be placed in more severe conditions when he arrived at SSCF. Without such knowledge on the part of a defendant, the Court cannot find it plausible that the defendant intended the prison transfer to result in "adverse" consequences. *See, e.g., Barnes v. Craft,* 2008 WL 3884369, at \*12 (N.D.N.Y. Aug. 18, 2008) ("it is appropriate for a court to focus on the adverse action *caused by the defendant or defendants in question* (rather than whatever bad things happened to the plaintiff following the taking of adverse action by the defendant or defendants)") (emphasis and parenthetical in original). I therefore recommend that Count 6 be DISMISSED.

**D. Retaliatory Destruction of Legal Materials (Count 12)**

**\*21** Defendants argue that Count 12 of the Complaint is barred by claim preclusion. McGee alleges in Count 12 that prison officials at SSCF deliberately mishandled his legal materials in retaliation for his grievances and lawsuits. In November 2009, McGee filed a "Complaint for Writ of Replevin in Detinet" in Windsor Superior Court, asking the state court to order the return of his

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

personal property, including legal materials. The case subsequently settled and was dismissed by the parties with prejudice. Defendants now contend that McGee is merely applying a "new legal theory to apply to the same set of facts." (Doc. 59 at 35.)

In a federal § 1983 suit, the same preclusive effect is given to a previous state court proceeding as would be given to that proceeding in the courts of the state in which the judgment was rendered. See 28 U.S.C § 1738; Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 82–83 (1984); Kremer v. Chemical Constr. Corp., 456 U.S. 461, 476 (1982). The Court must therefore decide what preclusive effect the Vermont courts would give to McGee's prior state court proceedings.

Under Vermont law, claim preclusion (also known as res judicata ) requires (1) a previous final judgment on the merits, (2) in a case that was between the same parties or parties in privity, and (3) the claim has been or could have been fully litigated in the prior proceeding. In re St. Mary's Church Cell Tower, 910 A.2d 925, 926 (Vt.2006). Under Vermont law, a stipulated settlement and dismissal has full preclusive effect. See Johnston v. Wilkins, 830 A.2d 695, 699 (Vt.2003). There can also be little doubt that the same parties or parties in privity were involved. See, e.g., Vega v. Lantz, 2006 WL 2788374, at *5 (D.Conn. Sept. 26, 2006) (finding privity among employees of Department of Correction) (citing Sunshine v. Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402–03 (1940); Cullen v. Paine Webber Group, Inc., 689 F.Supp. 269, 278 (S.D.N.Y.1988)).

However, there is a well-recognized exception to claim preclusion where the court in the first action had limited jurisdiction with respect to the available remedies. See Nestor v. Pratt & Whitney, 466 F.3d 65, 73 (2d Cir.2006). As explained in § 26(1)(c) of the Restatement (Second) of Judgments, this exception applies where

[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on

that theory or to seek that remedy or form of relief....

Restatement (Second) of Judgments § 26(1)(c) (1982); see also Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 382 (1985) ("With respect to matters that were not decided in the state proceedings ... claim preclusion generally does not apply where 'the plaintiff was unable to ... seek a remedy because of the limitations on the subject matter jurisdiction of the courts.' ") (quoting Restatement (Second) of Judgments § 26(1)(c) (1982)). Although not applied in this precise context, the Vermont Supreme Court has adhered to the general principle set forth in § 26 of the Restatement. See State v. Carroll, 765 A.2d 500, 502 (Vt.2000) (citing Restatement (Second) of Judgments § 26).

**\*22** Here, McGee sought injunctive relief in a state court proceeding pursuant to Vt. R. Civ. P. 64 and 12 V.S.A. §§ 5331 et seq. He reports that while some of his property was recovered, the legal materials were never found. (Doc. 71 at 105.) McGee is now seeking damages for the unrecovered items. His memorandum cites state case law for the proposition that "Vermont replevin statutes do not provide for recovery of value of items not replevied." (Id.) (citing Bagley v. Cooper, 99 A. 230 (Vt.1916)).

Defendants have not countered McGee's argument, and the Court has found no authority to the contrary. Accordingly, it appears that McGee could not have recovered damages in his replevin action, and that he is not barred by claim preclusion from seeking such relief here. Defendants' motion to dismiss Count 12 on the basis of claim preclusion should therefore be DENIED.

Moving to the question of personal involvement, McGee's allegations of supervisory action with regard to the events alleged in Count 12 are minimal. The Complaint asserts a single claim that "Defendants Carbonell, Kamel, Kupec, and Pallito investigated, but did not formally respond to, Plaintiff's grievances pertaining to his 'missing' or destroyed legal materials." (Doc. 7 at ¶ 570.) No other facts support the claim of four separate investigations. Furthermore, many courts have held that a supervisor's failure to respond is insufficient to establish

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

personal involvement. *See Mateo v. Fischer,* 682 F.Supp.2d 423, 430 (S.D.N.Y.2010) (collecting cases). I therefore recommend that the claims brought against Defendants Carbonell, Kamel, Kupec, and Pallito be DISMISSED.

McGee also claims that Defendant Salem was personally involved because she failed to expedite certain directives that would have improved the handling of inmate property. (Doc. 7 at ¶¶ 563–64.) Defendants argue that this claim, which essentially asserts that a failure to act was the cause of McGee's harm, is insufficient. In any event, "personal involvement of defendants ... is a prerequisite to an award of money damages under § 1983," *Farid,* 593 F.3d at 249, and no monetary relief is sought from Defendant Salem in Count 12. (Doc. 7 at ¶¶ 833–34.) The motion to dismiss Defendant Salem should therefore be GRANTED as to any claims for damages.

## VI. Privacy Claim (Count 8)

In Count 8, McGee claims that he and other inmates had to use a toilet that could be viewed by female Correctional Officers, thus denying him "his limited right to bodily privacy" under the Fourth Amendment. (Doc. 7 at ¶¶ 820–21.) The Second Circuit has recognized a limited interest in bodily privacy. (Doc. 59 at 35) (citing *Covino v. Patrissi,* 967 F.3d 73, 78 (2d Cir.1992)). The Circuit Court has also specifically acknowledged that "the involuntary viewing of private parts of the body by members of the opposite sex" is a "privacy interest entitled to protection." *Forts v. Ward,* 621 F.2d 1210, 1216–17 (2d Cir.1980).

**\*23** In the prison context, courts have paid particular attention to "the frequency or regularity of such 'viewing.' As a general rule, courts have found a violation only in those cases in which guards 'regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering." *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985); *see also Covino,* 967 F.2d at 78 (right to bodily privacy applies "even in the prison context"); *Cumbey,* 684 F.2d at 714 (noting that "[o]ther courts have held that if guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities, or showering, the inmates' constitutional

rights to privacy are being violated.").

This may be such a case. McGee claims that the toilet in the "fishtank" could be viewed both directly and via surveillance camera by female Correctional Officers. Although a more private inmate bathroom was allegedly available, one such Correctional Officer, Defendant Sullivan, denied inmates' requests to use it and instead "sat at her desk doing nothing but laughing and ogling at them." (Doc. 7 at ¶ 411.) McGee alleges that there was no legitimate penological reason for this alleged conduct, and Defendants have not offered any such reason.

Giving the Complaint the required liberal reading, McGee's claim that Sullivan denied "repeated" requests for use of a more private bathroom, one that would not expose them to "female security and non-security staff and civilian passersby," the Court should find that McGee has alleged sufficient facts to support a plausible claim. (*Id.* at ¶¶ 409–10.) McGee is not alleging a one-time or infrequent event. Rather, he is claiming that he and other inmates were denied privacy several times a day, over the course of several days, without reasonable justification. Such "regular" conduct by DOC personnel states a plausible privacy claim. *See, e.g., Cumbey,* 684 F.2d at 714. Defendants' motion to dismiss for failure to state a viable claim should therefore be DENIED.

With respect to personal involvement by supervisors, Defendants assert that the claims against Defendants Rutherford, McWard, Kupec, Pallito and Carbonell are each lacking. As to Defendants Rutherford and McWard, McGee explains in his opposition memorandum that these Defendants provided specific responses to his grievances, with Rutherford in particular providing an explanation of the reasoning behind the decision. (Doc. 71 at 121–22.) The claims against Rutherford and McWard should thus survive the motion to dismiss.

In contrast, the claims brought against Kupec and Pallito are that they never provided any sort of response. As discussed above, that is insufficient to establish the personal involvement of a supervisor for purposes of § 1983. Finally, while McGee concedes that the Complaint makes "no specific allegations concerning Defendant Carbonell," he invites the Court to infer that from her

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

daily rounds in the unit, she must have known that fishtank inmates using the toilet could be viewed by members of the opposite sex. (*Id.* at 124–25.) The Court should not allow such a speculative claim to proceed. *See Iqbal,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level...."). I therefore recommend that Defendants Kupec, Pallito and Carbonell be DISMISSED from Count 8.

**VII. Due Process Claim (Count 13)**

*24 Count 13 alleges that the DOC regularly deprived McGee of his personal property, including some of his legal materials. The alleged deprivations usually occurred during McGee's transfers between prison cells and facilities. McGee alleges that in nearly every instance, his personal property was taken without a corresponding property receipt, and on several occasions was lost.

Defendants first argue that only intentional deprivations are actionable under the Due Process Clause, and that negligence does not rise to the level of constitutional harm. Defendants also submit that "random and unauthorized" conduct by government officials requires only post-deprivation remedies. (Doc. 59 at 38) (citing *Hudson v. Palmer,* 468 U.S. 517, 534 (1984)); *see DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). McGee's claim, however, is that the deprivations of his personal property were so pervasive and predictable as to amount to a custom or practice by DOC officials. Stated somewhat differently, McGee is claiming that the deprivations were both authorized and intentional, and that a post-deprivation remedy was therefore inadequate.

The extent to which Defendants' conduct was either authorized or intentional has not yet been established. The pattern of conduct set forth in the Complaint, however, is sufficient to allege a plausible due process claim. Moreover, the number of items allegedly lost or confiscated—including a sweatshirt, shorts, an expensive pen, pajamas, socks, storage boxes, bowls and a cribbage board—amounts to a property interest greater than those cited by Defendants as *de minimis.* (Doc. 59 at 39–40.)

Defendants also argue, albeit briefly, that McGee has released them from liability with respect to each of his personal property claims. McGee signed a general release

on June 6, 2010, approximately five months after filing the Complaint in this case, releasing the DOC and its "officers, agents, employees ..." from liability with regard to his personal property claims. (Doc. 59–5 at 1.) The general release covers claims "related to my personal property from the beginning of the world to the day of the date of this release, expressly limited to any and all claims for damages, costs and/or for attorneys' fees in connection with, arising out of, or related to any of the claims asserted or that could have been asserted" in the replevin action (*McGee v. Southern States Corr. Facility,* No. 832–11–09–Wncv) and a separate action against former DOC Commissioner Steven Gold (*McGee v. Gold,* No. 108–2–06–Wncv). *Id.*

While the general release may have waived each of the claims set forth in Count 13, the Court cannot take that document into account at this time. *See, e.g., Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 498–99 (S.D.N.Y.2003). The general release is before the Court as an exhibit to Defendants' motion to dismiss. As it post-dated the Complaint, it was not mentioned in McGee's initial pleading.

*25 In deciding a 12(b)(6) motion, the Court may not consider evidence that is outside of the pleadings. Rather, the Court is limited to reviewing the four corners of the Complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the Court may take judicial notice. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000).

In this case, the Court should decline to convert Defendants' motion to a motion for summary judgment. Conversion to summary judgment would entail additional delay, not only with regard to Count 13, but as to all of the claims discussed above. I therefore recommend that rather

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

than delaying resolution on all claims while the parties submit statements of fact regarding Count 13, the Court instead decline to consider the general release at this time. The parties may re-submit the general release for the Court's consideration, with additional briefing, when procedurally appropriate.

This brings the Court again to the question of personal involvement. Defendants argue for dismissal on this basis on behalf of Martinson, Kupec, Oddy, Potanas, Edwards, Carbonell, Pallito and Salem. The allegation against Assistant Superintendent Martinson is that McGee spoke with him on several occasions regarding NSCF staff taking property without issuing receipts, but that Martinson did not cure the problem. This allegation appears to fit squarely with the second *Colon* factor, which requires notice and a failure to offer a remedy. 58 F.3d at 873. The alleged violation was ongoing, and notice appears to have been provided not merely through a standard grievance process or other written correspondence, but in the course of personal conversations between McGee and Martinson. *Cf. Anderson v. Duke,* 2006 WL 2792735, at *5 (N.D.N.Y. Sept. 27, 2006) (explaining that cases involving letters and grievances "are premised upon the inability to say with certainty that an ignored letter ... provides the basis to conclude that the recipient knew or reasonably should have been aware of the violation"). The Court should thus DENY the motion to dismiss Defendant Martinson.

As to Defendant Kupec, the allegation is that he was involved in McGee's state court litigation commenced in 2005. In the course of that litigation, Kupec reportedly submitted an affidavit regarding the proper use of property inventory forms in the prison setting. Kupec also allegedly "reiterated the need for Department staff to issue" inventory forms during a meeting of DOC facility superintendents in 2006. (Doc. 7 at ¶¶ 596–600).

*26 What McGee does not allege is that Kupec responded to any specific complaints or grievances. (*Id.* at ¶¶ 616, 731, 760 .) Moreover, the allegations in the Complaint suggest that to the extent Kupec was personally involved, he made efforts to improve the handling of prisoner property. The motion to dismiss Kupec for lack of personal involvement in constitutional violations should

therefore be GRANTED.

McGee's claim against Defendant Oddy, housing unit manager at the DOC's Out–of–State Office, is that Oddy failed to ensure the development and use of accurate property lists for out-of-state transfers. (*Id.* at ¶ 622.) McGee also alleges that Oddy was "repeatedly sent copies of the [Kentucky facility's] allowable property list." (*Id.* at ¶ 649.) Although McGee claims generally that the Property Officer in Kentucky "complained about the condition of property arriving from Vermont," it is not clear from the Complaint whether such notice went to Oddy directly. Nor is it apparent that Oddy reviewed such complaints. This sort of vague allegation of notice is insufficient to sustain a plausible claim of personal involvement, and the claim against Defendant Oddy should be DISMISSED.

Count 13 does not assert any specific allegations of supervisory involvement by Defendant Mark Potanas, chief of security at SSCF. (*Id.* at 38.) The motion to dismiss Potanas from Count 13 should therefore be GRANTED.

As to Defendant James Edwards, a Correctional Officer and property officer at SSCF, Defendants argue that McGee "offers only the conclusory allegations that Edwards knew about, participated in, or failed to correct certain policies." (Doc. 59 at 41.) McGee's allegations, however, are more than conclusory, providing specific details about Edwards' direct involvement in the handling of prisoner property. The Complaint alleges that Edwards called McGee to inventory his property, issued him property receipts, and told him which property needed to be sent to storage. (Doc. 7 at ¶¶ 690–92, 697–98, 700–01.) Edwards also made reference to "higher ups" having decided which property could be stored. Consequently, Defendants' arguments with respect to Edwards' liability as a supervisor, and that he lacked sufficient involvement in alleged property deprivations, are misplaced. The motion to dismiss Edwards from Count 13 should therefore be DENIED.

The claims in Count 13 being brought against Defendant Anita Carbonell, SSCF's Superintendent, are that McGee wrote her more than once regarding the

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

treatment of his personal property. Carbonell allegedly responded in writing, sometimes granting McGee's requests, and at other times requiring that his property be sent to storage. (*Id.* at ¶¶ 702–06.) This level of involvement is sufficient to state a plausible claim of supervisor liability under *Colon.*

Commissioner Pallito is also named in Count 13. In 2009, Pallito allegedly responded to McGee's grievance regarding property receipts, stating that an investigation had revealed that " 'inmates who arrive awaiting out of state transfer are routinely not provided with property receipts while at SSCF.' " (*Id.* at ¶ 654.) Pallito was therefore aware of the alleged problem, and personally responded in a way that may subject him to liability if the underlying policy was unconstitutional. *See, e.g., Charles, 2009 WL 890548, at \*6.*

**\*27** Finally, Defendants move to dismiss the claims in Count 13 being brought against Defendant Salem. As in Count 12, the claim is that Salem failed to implement corrective policies. Unlike Count 12, McGee is seeking damages against Salem for her alleged actions. Notably absent in Count 13 are any allegations that Defendant Salem had notice of the alleged violations. (Doc. 7 at ¶¶ 761–63.) The claims against Defendant Salem should therefore be DISMISSED.

## VIII. Qualified Immunity

Defendants further argue that, with respect to McGee's constitutional claims, they are entitled to qualified immunity. This argument is premature.

Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims ... as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton, 483 U.S. 635, 638 (1987).* "Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage." *Charles v. New York State DOCS, 2009 WL 890548, at \*10 (N.D.N.Y. Mar. 31, 2009)* (citing *McKenna v. Wright, 386 F.3d 432, 436–37 (2d Cir.2004)).* "The defense must be based on facts appearing on the face of the complaint."

*Id.* at \* 10 (citing *Benzman v. Whitman, 523 F.3d 119, 125 (2d Cir.2008); see also Bernstein v. City of New York, 2007 WL 1573910, at \*9 (S.D.N.Y. May 24, 2007)* ("[b]ecause the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6)' ") (quoting *Walker v. Mendoza, No. 00 Civ. 93, 2000 WL 915070, at \*7 (E.D.N.Y. June 27, 2000)).*

In this case, Defendants argue qualified immunity as a general matter, relying primarily on their previous arguments for dismissal. With little further analysis, the Court should not conclude that Defendants are entitled to qualified immunity based solely on the allegations set forth in the Complaint. "Depending on what evidence is adduced through discovery, dismissal of plaintiff's claims against [the Defendants] may be warranted on a properly supported motion for summary judgment, but at this point, dismissal on this basis as to [the Defendants] is premature." *See Rivera v.. Fischer, 655 F.Supp.2d 235, 239–40 (W.D.N.Y.2009).* I therefore recommend that the Court decline to dismiss any claims on the basis of qualified immunity at this time.

## IX. Sovereign Immunity

Defendants also contend that DOC Commissioner Pallito is entitled to sovereign immunity with respect the claims brought against him in Counts 5 through 13. The Eleventh Amendment prohibits suits for damages brought in federal court against unconsenting states or state officials sued in their official capacities. *See Edelman v. Jordan, 415 U.S. 651, 663 (1974).* As the Supreme Court has explained, "an official-capacity suit against a state officer 'is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." *Hafer v. Melo, 502 U.S. 21, 26 (1991)* (quoting *Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)).*

**\*28** A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed. *See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984).* Additionally, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment. *Fitzpatrick v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

*Bitzer,* 427 U.S. 445, 456 (1976). Relevant to this case, Congress has not abrogated Vermont's sovereign immunity from a § 1983 suit in federal court. *See Will,* 491 U.S. at 67. Moreover, the State of Vermont has expressly preserved its sovereign immunity under the Eleventh Amendment. *See, e.g.,* 12 V.S.A. § 5601(g). McGee's claims for damages against Commissioner Pallito in his official capacities are therefore barred by the Eleventh Amendment, and should be DISMISSED.

**X. State Law Claims**

In addition to federal constitutional claims, each Count of the Complaint sets forth a state statutory or constitutional claim. Defendants argue for dismissal of these state law claims on the ground that the cited provisions "have not been recognized as supporting private causes of action, are plainly inapplicable to the claims in his Complaint, or both." (Doc. 59 at 41.) McGee's opposition memorandum does not respond to this portion of the motion to dismiss. The Court must nonetheless review the Defendants' arguments to determine if dismissal of the state law claims is warranted. *See McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000).

In the first twelve Counts, McGee cites various Articles within Chapter I of the Vermont Constitution. These citations include references to Chapter I, Article 4, which the Vermont Supreme Court has determined "does not 'create substantive rights.' " *Mellin v. Flood Brook Union Sch. Dist.,* 790 A.2d 408, 422 (Vt.2001) (quoting *Shields v. Gerhart,* 658 A.2d 924, 927 (Vt.1995)). With respect to McGee's other citations within Chapter 1, specifically Articles 11, 18 and 20, there is no Vermont case law supporting a private right of action under those provisions. *See generally Shields,* 658 A.2d at 930–34. The same is true of McGee's statutory citations to 28 V.S.A. §§ 601, 801 and 853. *Cf. Borden v. Hofmann,* 974 A.2d 1249, 1252–56 (Vt.2009) (analyzing alleged § 851 violation under federal substantive due process standards).

Defendants further argue that McGee's claim under Chapter I, Article 10 is misplaced. That constitutional provision bars the State from depriving a person of his liberty without due process of law, and pertains to "prosecutions for criminal offenses...." *See* Vt. Const. Ch. I, Art. 10; *see Parker v. Gorczyk,* 744 A.2d 410, 416 (Vt.1999). As this case does not involve a criminal

prosecution, Article 10 has no application here. Similarly, Article 2 of Chapter I pertains to governmental takings, and thus requires compensation for "property taken for the use of the public." Vt. Const. Ch. I, Art. 2. Article 2 does not apply to the loss or confiscation of a prisoner's personal property, particularly when there is no allegation the property was taken for "use of the public." *See, e.g., Allen v. Wood,* 970 F.Supp. 824, 831 (E.D.Wash.1997) (no takings claim where inmate failed to show "that property he was authorized to receive was taken for public use").

**\*29** McGee's final state law citation is to 28 V.S.A. § 708. That statute pertains to an inmate's discharge from confinement, with subsection (b) requiring the return of an inmate's personal possessions. 28 V.S.A. § 708(c). McGee is currently incarcerated, and was incarcerated during all of the events alleged in the Complaint. Section 708 of Title 28 thus does not apply to this case.

For each of these reasons, I recommend that McGee's state law claims be DISMISSED.

**XI. McGee's Motion to Amend Complaint**

To the extent that the Court is dismissing any claims, McGee has moved for leave to amend his Complaint to cure any deficiencies. I find that this motion is premature, and that it does not comply with the Local Rules. Local Rule 15 requires a redlined version of a proposed amendment "clearly designating additions and deletions." L.R. 15(a). While the Court acknowledges that red-lining may be difficult for a prison inmate to execute, at the very least the Court must know what amendments are planned before granting leave to amend. This is particularly true with a Complaint of the size presented in this case. The motion to amend (Doc. 82) is therefore DENIED without prejudice to re-filing.

*Conclusion*

For the reasons set forth above, I recommend that Defendants' motion to dismiss (Doc. 58) be GRANTED in part and DENIED in part. Specifically, I recommend that Counts 1, 2, 4, 6, 7, and 9 be DISMISSED in their entirety. I recommend that Count 3 be DISMISSED except with regard to McGee's claims of inadequate winter clothing, and the claims related to his sweatpants. Also,

Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)

(Cite as: 2011 WL 6291954 (D.Vt.))

Defendant Martinson should be DISMISSED from Count 3 for lack of personal involvement.

In Count 5, Defendant Salem should be DISMISSED insofar as McGee is seeking damages. In Count 12, Defendants Carbonell, Kamel, Kupec, Pallito and Salem should each be DISMISSED, again to the extent that McGee is seeking damages. In Count 8, Defendants Kupec, Pallito and Carbonell should be DISMISSED from McGee's claims for damages. And in Count 13, Defendants Kupec, Oddy, Potanas and Salem should be dismissed from any claims for damages. All state law claims should be DISMISSED. Defendants' motion to dismiss should otherwise be DENIED.

The motion to dismiss submitted by Defendant Prison Health Services (Doc. 62), which pertains only to Count 11 and adopts the State Defendants' arguments, should be DENIED.

McGee's motion for leave to amend (Doc. 82) is DENIED without prejudice to re-filing, and his motion to order Defendants to send him copies of all documents submitted to the Court (Doc. 79) is also DENIED. The Court does, however, expect Defendants to comply with their service obligations under the Federal Rules of Civil Procedure.

D.Vt.,2011.

McGee v. Pallito
Not Reported in F.Supp.2d, 2011 WL 6291954 (D.Vt.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3522781 (N.D.N.Y.)

(Cite as: 2009 WL 3522781 (N.D.N.Y.))



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Timothy J. TAYLOR, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; D. Eaton, Senior
Corrections Counselor, Gowanda Correctional Facility;
Jack Fix, Corrections Counselor, Gowanda Correctional
Facility; George Pundt, Correctional Counselor, Cayuga
Correctional Facility; Thomas Oberg, Corrections
Counselor, Cayuga Correctional Facility; Nancy
Hulihan, Superintendent of Programs, Oneida
Correctional Facility; A. Joslyn, Assistant Deputy
Superintendent of Programs, Oneida Correctional
Facility, Defendants.
No. 9:07–CV–1288 (NAM/RFT).

Oct. 29, 2009.
Timothy J. Taylor, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christina L. Roberts–Ryba, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.
    **\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brought this action under 42 U.S.C. § 1983, claiming
various constitutional deprivations in connection with his
participation in DOCS Sex Offender Counseling and
Treatment Program ("SOCTP"). Defendants moved
(Dkt.Nos.50, 79, 95) for judgment dismissing the amended
complaint (Dkt. No. 46). Upon referral pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United

States Magistrate Judge Randolph F. Treece issued a
Report and Recommendation (Dkt. No. 107) in which he
recommends that defendants' motions be granted in part
and denied in part. Plaintiff has submitted an objection
(Dkt. No. 111), as have defendants (Dkt. No. 112). In
view of the parties' objections, this Court conducts a *de
novo* review. *See* 28 U.S.C. § 636(b)(1) (C).
    Magistrate Judge Treece's Report and
Recommendation sets forth the background of the case.
Magistrate Judge Treece also describes the settlement
agreement in *Donhauser v. Goord* (Case No.
9:01–CV–1535, Dkt. No. 239), entered on October 17,
2008, a month after the amended complaint herein was
filed on September 16, 2008. Magistrate Judge Treece
concludes that the settlement agreement in *Donhauser* "is
binding on Plaintiff to the extent his claims are the same
as those disposed of in *Donhauser.*" The Court agrees that
plaintiff's claims to the effect that he was forced to admit
to uncharged crimes are the same as those disposed of by
the settlement agreement, and adopts Magistrate Judge
Treece's recommendation that such claims be dismissed as
moot. These claims constitute a large proportion of the
amended complaint.

    Magistrate Judge Treece notes that plaintiff also
asserts claims in the instant action that "are not entirely
identical to those brought in *Donhauser.*" As to such
claims, Magistrate Judge Treece recommends that
dismissal be denied. The Court agrees with this
recommendation except with regard to plaintiff's
allegations that he was required to implicate family
members and to confess to crimes he did not commit. As
explained below, the Court dismisses any claims based on
these allegations.

    Plaintiff avers that as part of his participation in
SOCTP, he was pressured to implicate family members in
crimes in which they were not involved (for example,
abusing him when he was a child), and that any statements
plaintiff gave in response to the pressure were used "as
ammunition to hurt and belittle" plaintiff. He also avers
that he was required to admit to crimes he did not commit.
Essentially the same allegations were contained in the

Not Reported in F.Supp.2d, 2009 WL 3522781 (N.D.N.Y.)

(Cite as: 2009 WL 3522781 (N.D.N.Y.))

second amended complaint in *Donhauser* and were resolved by the *Donhauser* settlement agreement. [FN1] To the limited extent that the allegations plaintiff now asserts in this regard are not precisely the same as those in the *Donhauser* complaint, they were within its scope and within the scope of the settlement agreement. The Court notes in particular that the settlement agreement specifies what the inmate must do to complete the program successfully, and under the wording of the settlement agreement, inmates are not required to fabricate confessions or falsely implicate family members in order to participate successfully in the program. Rather, the settlement agreement specifies that for successful program participation the inmate "must openly and honestly discuss the behavior that resulted in [his] incarceration and referral to the program, demonstrate acceptance of responsibility for the conduct that resulted in [his] criminal conviction and demonstrate an understanding of [his] sexual offending behavior and cycle of abuse." Any claims based on allegations regarding fabricated confessions, implication of family members, and similar allegations are precluded by virtue of the settlement agreement.

> FN1. For example, the second amended complaint in *Donhauser* (Case No. 9:01–CV–1535, Dkt. No. 13) alleged: that plaintiff wanted to "maintain his innocence during the program"; that in the program he would be "forced to admit to uncharged acts of sexual abuse with the alleged victim"; and that he "did not want to write out a personal history about his family" because "[his] family is not in prison why should [he] give personal information about [his] family['s] lives." The second amended complaint also sought a declaration that the requirement that plaintiff provide a detailed sexual history violated the First and Fifth Amendments and an injunction against such a requirement.

**\*2** Plaintiff complains that inmates who participate in SOCTP are not retained in that program at a rate equal to inmates in other programs, and that inmates incarcerated for sex offenses do not have a constitutionally-protected right to be granted parole at a rate equal to inmates who have been convicted of similarly serious crimes. To the

extent that the complaint may be read to assert an equal protection cause of action, it is not subject to dismissal at this stage. Although sex offenders do not comprise a suspect or quasi-suspect class for equal protection purposes, the allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest. *See Ruggia v. Kozak,* 2008 WL 541290, \* 18 (N.D.N.Y. Feb.25, 2008). Rational basis analysis cannot be conducted on this motion addressed to the pleadings.

Plaintiff complains that he was improperly removed from SOCTP and that there is no oversight of the counselors who determine whether someone should be removed from or re-admitted to SOCTP. The Court cannot determine at this point whether plaintiff exhausted these complaints or whether they support a cognizable cause of action, and they are not subject to dismissal at this time. The Court agrees with Magistrate Judge Treece that plaintiff's due process claim and his claim that he was retaliated against due to his participation in *Donhauser* cannot be dismissed at this point.

It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 107) is accepted in part and rejected in part; and it is further

ORDERED that defendants' motions to dismiss the amended complaint (Dkt. Nos.50, 79, 95) are granted to the extent that the Court dismisses all claims based on the allegations that plaintiff was forced to admit to uncharged crimes, to fabricate crimes, and to implicate family members in crimes which they did not commit, and similar allegations; and the motions are otherwise denied; and it is further,

ORDERED that this case is Deemed Trial Ready as of December 14, 2009. The Parties are directed to file a Status Report on any outstanding issues, and the estimated length of trial. The status report shall be filed on or before November 9, 2009.

IT IS SO ORDERED.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3522781 (N.D.N.Y.)

(Cite as: 2009 WL 3522781 (N.D.N.Y.))

N.D.N.Y.,2009.

Taylor v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2009 WL 3522781
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

David STEPHENSON, Plaintiff,

v.

ALBANY COUNTY POLICYMAKERS, et al.,
Defendants.

Civ. No. 6:09-CV-326 (LEK/RFT).

Aug. 14, 2009.

David Stephenson, Marcy, NY, pro se.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** The Clerk has sent to the Court a civil rights
Complaint (Dkt. No. 1), Motion to Proceed *In Forma
Pauperis* (IFP) (Dkt. No. 2), Motion for Joinder of Claims
(Dkt. No. 3), and a Motion to Appoint Counsel and
Conduct Discovery (Dkt. No. 6), filed by *pro se* Plaintiff
David Stephenson, who is currently incarcerated at Marcy
Correctional Facility.[FN1] In his *pro se* Complaint,
Stephenson alleges civil rights violations based upon, *inter*

*alia,* malicious prosecution, abuse of process, conspiracy,
fraud, invasion of privacy, and attorney malpractice. For
a more complete statement of Plaintiff's claims, reference
is made to the Complaint.

FN1. In 2006, Stephenson filed a civil rights
action in this Court, pursuant to 42 U.S.C. §
1983, *Stephenson v. Herrick,* Civ. No.
1:06-CV-1466 (GLS/DRH), which was
dismissed by the Court, *sua sponte,* for failure to
state a claim upon which relief could be granted.
Stephenson's Petition for a Writ of *Habeas
Corpus,* pursuant to 28 U.S.C. § 2254, is also
pending in this Court, *Stephenson v.
Superintendent,* Civ. No. 9:08-CV-1243
(LEK/RFT).

**I. DISCUSSION**

**A. Application to Proceed *In Forma Pauperis***

Plaintiff has submitted an *In Forma Pauperis*
Application. The Prison Litigation Reform Act (PLRA),
codified in part at 28 U.S .C. § 1915(b), provides that an
inmate who seeks *in forma pauperis* status is required to
pay over a period of time the full amount of the filing fee
provided for in 28 U.S.C. § 1914(a), which is currently
$350.00 for most civil actions. After reviewing Plaintiff's
Application, we find that he may properly proceed *in
forma pauperis.*

**B. Allegations Contained in the Complaint**

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that ... the action or appeal (i) is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed further with his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as soon as practicable, *sua sponte* review "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employees of a governmental agency" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (*per curiam* ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); *see also Myers v. Wollowitz,* 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

**\*2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

*See generally* Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims for money damages are relevant to the same set of**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

**facts."** Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme Court has held that

> FN2. A similar *fait accompli* vanquished Stephenson's prior attempt to sue various individuals in this Court, *Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH). Upon information and belief, the core events giving rise to Stephenson's prior § 1983 action are the same events giving rise to the current action. That prior civil rights action was dismissed in light of *Heck v. Humphrey,* 512 U.S. 477 (1994). *See Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9, Decision and Order, dated Mar. 8, 2007.

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

Plaintiff's claims in this action are barred because he has failed to show that his conviction or sentence has been overturned. *See Duamutef v. Morris,* 956 F.Supp. 1112, 1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and

civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned). Because all of Plaintiff's claims relate to events that gave rise to Plaintiff's conviction and the sentence he is currently serving, many of which are currently interposed in his pending *Habeas Corpus* Petition,[FN3] this action is barred under *Heck* and we recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable basis in law. We note that this recommendation is limited to all § 1983 claims asserted by Plaintiff. Plaintiff has also inserted some state law claims sounding in fraud and attorney malpractice. It is not clear whether Plaintiff intended to assert these claims in support of his § 1983 claims, or if he intended them to stand on their own, thereby invoking the Court's pendent jurisdiction to entertain state law claims. To the extent they are part and parcel of the § 1983 claims, then they too suffer the same infirmity and are barred by *Heck*. To the extent, however, that they are purely state law claims, in light of this Court's recommendation of dismissal of the federal claims, we would recommend the Court not exercise pendent jurisdiction of such state law claims, pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).

> FN3. Stephenson raises the following grounds, *inter alia,* in support of his *Habeas* Petition:

> 1) he was denied equal protection and due process in state court when he was denied, *inter alia,* a grand jury and was subjected to an insufficient accusatory process and was victim of an illegal search and seizure;

> 2) he was a victim of selective prosecution and "Mode of Proceedings error"; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

3) his guilty plea was unknowing and unintelligent due to ineffective assistance of counsel.

*Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

### C. Other Pending Motions

**\*3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted; and it is further**

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S .C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

**\*4** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint is **DISMISSED WITHOUT PREJUDICE,** pending the outcome of Plaintiff's pending habeas petition; and accordingly all other pending Motions in this case (Dkt. Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.

Stephenson v. Albany County Policymakers

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.